James PRICE, Plaintiff,

v.

Sharon Pratt KELLY, et al., Defendants.

Civ. A. No. 93–1299 (RCL).

United States District Court,
District of Columbia.

March 24, 1994.

James Price, pro se.

William R. Morel, Asst. Corp. Counsel,
D.C., Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment. Upon consideration of the parties' filings and the relevant law, and for the reasons stated below, defendants' motion shall be GRANTED in accordance with this memorandum opinion.

### I. Introduction

This is a *pro se* action brought by plaintiff James Price seeking damages and equitable relief under 42 U.S.C. section 1983 against Sharon Pratt Kelly, Mayor of the District of Columbia, and certain officials of the District of Columbia Department of Corrections. These officials hold positions in the D.C. Detention Facility, and they include John Henderson, Administrator; Patricia Britton, Assistant Administrator; Robert Fulton, Major; Lee Broadnax, Sergeant; McKenzie Harris, Corporal; Hazel Lee, Corporal; and a Mr. Scott, Case Manager. Plaintiff claims defendants violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

Plaintiff's factual allegations must be presumed true and liberally construed in favor of the plaintiff when reviewing the adequacy of a complaint for purposes of a Rule 12(b)(6) motion. *Phillips v. Bureau of Prisons,* 591 F.2d 966, 968 (D.C.Cir.1979) (citing *Miree v. Dekalb County, Georgia,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2493 n. 2, 53 L.Ed.2d 557 (1977)). In addition, the plaintiff must be given every favorable inference that may be drawn from his allegations of fact. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). "However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." 2A *Moore's Fed-*

*eral Practice,* § 12.07, at 63 (2d ed. 1986) (footnote omitted); *see Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987) (citing *Pauling v. McElroy,* 278 F.2d 252, 254 (D.C.Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960)).

Dismissal is only appropriate if it appears beyond doubt that no set of facts proffered in support of plaintiff's claim would entitle him to relief. *Haynesworth,* 820 F.2d at 1254 (citations omitted); *Phillips,* 591 F.2d at 968. Plaintiff's factual allegations are set out below.[1]

### II. Facts

This action resulted from a series of disciplinary reports ("D.R.") filed by jail officials against plaintiff James Price while he was confined as a pretrial detainee at the District of Columbia Detention Facility. Plaintiff claims that D.C. Department of Corrections officials failed to provide him with his procedural rights in connection with the resolution of these D.R.'s. These alleged violations occurred over a period of approximately two months beginning in April 1993. The specific events leading to this dispute are detailed in chronological order below.

On April 7, 1993, plaintiff received two D.R.'s, one charging him with possession of major contraband ("shoots," i.e., homemade wine) and the other charging him with exhibition of threatening conduct toward the prison staff. The following day, plaintiff requested that he be represented by counsel for adjudication of the D.R.'s before the facility's Adjustment Board ("Board"). On April 9, 1993, plaintiff was brought before the Board for a D.R. hearing. He notified the Board that he desired legal representation but had not yet spoken to his attorney. The Board agreed to postpone the hearing until April 14 to afford plaintiff an opportunity to contact his attorney. Meanwhile, plaintiff was placed in administrative segregation pending his hearing on the D.R.'s.

---

1. Plaintiff supplemented his complaint with additional facts alleged in his opposition to defendants' motion to dismiss or, in the alternative, for summary judgment. Generally, for the purpose of ruling on a motion to dismiss, the court would consider only those facts pleaded in the complaint. However, in light of plaintiff's *pro se* status, and given that the court would grant plaintiff leave to amend his complaint to allege additional facts, the court finds it appropriate to consider all of plaintiff's proffered facts. The court thus deems the additional facts alleged in plaintiff's opposition to have been filed as part of an amended complaint.

Despite postponement of the hearing, plaintiff was at first given no opportunity to call his attorney, and prison officials refused to make the call on his behalf. On April 13, plaintiff finally managed to contact his attorney, Ms. Tracy Whittaker of the D.C. Public Defender Service. Ms. Whittaker placed the Board on notice of her intent to represent plaintiff, and requested copies of the D.R.'s and other documentation. It took Ms. Whittaker more than a month of repeated inquiries before she received the requested documentation.

On the following day, April 14, 1993, plaintiff was again brought before the Board. Plaintiff informed Corp. Harris that he wished to wait for Ms. Whittaker to arrive before beginning the hearing. Corp. Harris refused to delay the hearing further, and responded simply by stating, "Okay, you've got a lawyer, so you're guilty." For this guilty finding the Board revoked plaintiff's inmate privileges and placed him in administrative segregation for twenty-eight days (fourteen days for each D.R.). Plaintiff filed both an appeal and an Inmate Grievance with Administrator Henderson regarding the Adjustment Board's allegedly improper adjudication of his D.R.'s. The Administrator never responded to the appeal, and dismissed the grievance as groundless.

Plaintiff was called before the Board again on April 28, 1993 to face a disciplinary hearing for disrespect and lack of cooperation. Plaintiff informed the Board that he had not received any notice of this D.R., and that he again wished to be represented by counsel. The Board denied plaintiff his request and found him guilty of the charges without a hearing, imposing an additional fourteen days' loss of privileges and administrative segregation.

Ms. Whittaker came to visit plaintiff at the jail on May 6, 1993. Officer Lewis informed plaintiff of the visit at approximately 6:00 p.m., placed him in handcuffs, and then left plaintiff in his cell handcuffed until 8:00 a.m. the next morning. Corrections officials never allowed plaintiff to see his attorney, and he was forced to sleep in handcuffs.

Plaintiff received yet two more D.R.'s on May 11 and May 12, 1993. Both D.R.'s charged plaintiff with disrespect and lack of cooperation toward the correction officers for exposing himself in an unseen manner, using profanity, and refusing to obey orders. Plaintiff notified the officials that he wished to be represented by counsel in connection with these D.R.'s, and requested assistance with contacting his attorney. Plaintiff was called before the Adjustment Board for a disciplinary hearing on May 12, at which time he repeated his request for counsel. The Board postponed the hearing until May 18, 1993.

Several times between May 12 and May 17, plaintiff asked his facility case manager, Mr. Scott, to assist him in making a legal phone call to notify his attorney of the impending hearing. Despite his repeated requests, Mr. Scott did not provide any such assistance, and plaintiff was never given the opportunity to contact his attorney before the hearing.

On May 18, 1993, as scheduled, plaintiff was once again called before the Adjustment Board to adjudicate the May 11 and May 12 D.R.'s. Plaintiff reminded the Board of his request for representation, and stated that he still had not been given the opportunity to contact his attorney. The Board refused plaintiff any further opportunity to contact his attorney and proceeded with the disciplinary hearing. As a result of the hearing, the Board found plaintiff guilty of *three* D.R.'s—although plaintiff was aware of only the above-mentioned *two* D.R.'s—and placed him in administrative segregation for forty-eight days. Nothing became of plaintiff's subsequent appeal and Inmate Grievance filed with Administrator Henderson. Plaintiff filed this action on June 24, 1993.

### III. *Discussion*

Defendants base their motion to dismiss the complaint or, in the alternative, for summary judgment, on three separate grounds: (1) plaintiff fails to articulate a recognized liberty interest in remaining in the general population cell block; (2) individual defendants are entitled to the qualified immunity defense; and (3) plaintiff fails to allege the personal involvement of certain high-level de-

fendants. The court now considers each of defendants' claims in order.

## A. *Due Process Liberty Interest*

Defendants first contend that the facts pleaded by plaintiff do not give rise to a violation of the Due Process Clause. More specifically, they argue that corrections officials did not deprive plaintiff of a protected liberty interest in placing him in administrative segregation. Defendants further argue that assuming corrections officials did deprive plaintiff of a liberty interest, the procedures attendant upon that deprivation were constitutionally sufficient.

■ Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the states. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). The court need not consider whether the Due Process Clause implicitly creates an interest in being confined to a general population cell. The Supreme Court has already concluded that it does not. *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983).

Even when the Due Process Clause itself does not establish a liberty interest, a state may still do so through its enactment of a relevant statute or regulation. *Thompson*, 490 U.S. at 461–62, 109 S.Ct. at 1909. Indeed, the Supreme Court has repeatedly held that state law may create enforceable liberty interests in the prison setting. *See, e.g., Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (prison regulations granted inmates a protected interest in parole); *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (prison regulations granted inmates a pro-

tected interest in freedom from more restrictive forms of confinement within the prison).

■ But the mere existence of any prison regulations with procedures that guide the use of administrative segregation does not itself suffice to create a liberty interest.[2] Rather, the state regulations (or statute) must use *mandatory* language creating substantive predicates to limit official discretion. *Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871. In other words, they must contain "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." *Thompson*, 490 U.S. at 463, 109 S.Ct. at 1910. Thus, it is the mandatory nature of prison regulations—such that they serve to limit discretion—that is integral to creating a liberty interest.

■ Plaintiff asserts that the regulations at issue here satisfy the *Thompson/Hewitt* requirements, and thus create a liberty interest in remaining in the general inmate population.[3] As support for this claim, plaintiff points to various sections of the Service Order containing mandatory language—sections that defendants allegedly violated. For example, a section of the Service Order entitled "Filing and Investigation of Charges" provides that an official who becomes aware of an inmate's misconduct "must make sufficient investigation" before preparing a D.R. and "shall provide the resident concerned with a written copy of the report." Moreover, prior to an Adjustment Board hearing on the D.R., the resident "shall be advised" of his right to representation at the hearing, and corrections officials "will make arrangements [if the resident should desire] such representation." If an inmate chooses to appeal the results of a disciplinary hearing, the "the Superintendent will review all deci-

---

**2.** The Supreme Court in *Hewitt* described the illogic of such a conclusion: "It would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause." *Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871.

**3.** These regulations are known as the "Adjustment Board Procedures," and appear in D.C. Department of Corrections Service Order 5300.1B ("Service Order"). The Service Order's stated purpose is to establish uniform policy and procedures for the conduct of Adjustment Board hearings at the D.C. jail. The Adjustment Board presides over disciplinary hearings within the jail, and upon findings of inmate misconduct imposes punishment, which may include placement in segregation.

sions of the Adjustment Board." Finally, the Service Order establishes specific conditions for placing residents in segregation.

Plaintiff argues that in light of this repeated use of mandatory language, the Department of Corrections regulations have satisfied the *Thompson/Hewitt* test. That is, by requiring that certain procedures "shall," "will," or "must" be employed before corrections officials may place a resident in segregation, the District of Columbia has created a liberty interest. Plaintiff claims, therefore, that defendants deprived him of minimum due process of law when they restricted his housing status and privileges without adhering to the procedures outlined in the Service Order.

Plaintiff's argument rests on an overly simplistic interpretation of the *Thompson* and *Hewitt* holdings and overlooks a key distinction between those decisions and the instant case. The Supreme Court in *Hewitt* dealt with regulations that had been promulgated by the Pennsylvania State Bureau of Corrections and published in the Pennsylvania codes. Similarly, the regulations at issue in *Thompson* had been officially enacted by the Kentucky legislature.[4] Thus, in both cases the regulations had been clearly adopted by the states themselves and had a binding effect on the applicable prison administrators. That left the Court with but a single inquiry: Whether the regulatory language was sufficiently mandatory to confer a liberty interest.

In this case, by contrast, the regulations are merely internal procedures adopted by the Superintendent of the D.C. Department of Corrections Detention Facility. They have not been promulgated by the District of Columbia, nor are they binding on the Superintendent.[5] The Superintendent may presumably revoke the Service Order at any time—without showing any justification. Of course, as previously discussed, the Service

Order does utilize mandatory language in defining the Adjustment Board Procedures. But that mandatory language makes the procedures binding on certain *employees* of the Department of Corrections, not on the department itself. The Superintendent does not act on his own behalf; he must give instructions to his underlings. Hence the mandatory language.

The Supreme Court has not had occasion to decide this issue of whether an internal policy directive, as opposed to a statute or published regulation, may suffice to create a liberty interest. However, the court of appeals for this circuit has addressed this question. A split panel held that "a prisoner may acquire a protected liberty interest by virtue of [unpublished] policy statements or regulations promulgated by administrators of the particular institution at which the prisoner is confined." *Lucas v. Hodges*, 730 F.2d 1493, 1504 (D.C.Cir.1984), *vacated as moot*, 738 F.2d 1392 (D.C.Cir.1984).

■ Because *Lucas* has been vacated, it is no longer binding authority in this circuit. Even so, it is worthy of the court's close review. The court has given the majority opinion its due attention, yet finds the reasoning in Judge Starr's dissent more persuasive. In Judge Starr's view, a liberty interest must arise from state or federal law; an internal document is not enough. *Lucas*, 730 F.2d at 1507 (Starr, J., dissenting). Otherwise, prison administrators could simply create or destroy liberty interests on a whim through a mere internal administrative device. *Id.* at 1507–08. The Due Process Clause cannot be stretched to such an extent.

The court agrees with Judge Starr's concerns and finds that the Supreme Court did not intend its decisions in *Hewitt* and *Thompson* to mean that prison regulations could create a liberty interest when the regulations are not binding on the prison adminis-

---

4.  In 1981 the Commonwealth of Kentucky issued "Corrections Policies and Procedures" as part of a settlement decree in civil rights litigation brought by Kentucky prison inmates.

5.  This is in marked contrast to the Lorton Regulations Approval Act ("LRAA"), which was officially adopted by the D.C. City Council. The

LRAA has a binding effect on even the most senior correctional officials. This court held in an unpublished opinion that the LRAA created a protected liberty interest with respect to prisoners' confinement in maximum security at the Lorton facility. *See Byrd v. District of Columbia*, Civil Action No. 92–0608 (RCL).

trator himself. Rather, regulations must be a product of the state legislative process in order to create a liberty interest.

Considering the above criteria, the regulations at issue in this case do not establish a liberty interest. The Service Order is nothing more than an internal document issued by the Superintendent of the Detention Facility. The District of Columbia City Council did not enact the Adjustment Board Procedures as part of a district-wide statute, and played no other part in its existence. Despite the Superintendent's use of mandatory language, the regulations do not bind his discretion. Therefore, plaintiff's due process claim fails for lack of a liberty interest.[6]

### B. Qualified Immunity Defense

■ Defendants next argue that they are entitled to the defense of qualified immunity for their alleged misconduct. They contend that because they were acting in their official capacities as detention facility employees when they subjected plaintiff to disciplinary proceedings, they cannot be held individually liable for any wrongful acts they may have committed in connection with that conduct. The court agrees with this contention.

The Supreme Court established the current qualified immunity analysis in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In that case the plaintiff, a Department of Air Force employee, alleged that two senior White House aides to former President Nixon conspired to wrongfully terminate him. The Court held that by virtue of their official executive positions, defendants enjoyed qualified immunity from civil liability. *Id.* at 807, 102 S.Ct. at 2732. The Court further specified the test to determine whether a defendant may claim qualified immunity, as follows: "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. This amounts to a two part test: First, whether the defendant violated the plaintiff's federal rights; second, whether those rights were clearly established from an objective point of view.

■ The shield of qualified immunity applies to federal and state officials alike who are sued for constitutional violations. *Butz v. Economou*, 438 U.S. 478, 500, 98 S.Ct. 2894, 2907, 57 L.Ed.2d 895 (1978). Since *Harlow*, the Supreme Court has identified corrections employees as part of the class of officials who may claim the qualified immunity defense. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). The court of appeals for this circuit has also recently recognized qualified immunity in the context of prisoners suing prison officials. *See, e.g., Kimberlin v. Quinlan*, 6 F.3d 789 (D.C.Cir.1993) (qualified immunity conferred on Director of Bureau of Prisons when inmate brought section 1983 suit alleging violation of his constitutional rights for denial of access to the press and due process of law); *Crawford–El v. Britton*, 951 F.2d 1314 (D.C.Cir.1991) (qualified immunity recognized for prison officials in connection with inmate's section 1983 suit claiming that prison official's misdelivery of his legal papers during prison transfer was intentional interference with his constitutional right of access to the courts); *Brogsdale v. Barry*, 926 F.2d 1184 (D.C.Cir.1991) (Mayor and corrections officials granted qualified immunity from civil rights claims under section 1983 after prisoners were injured in a fire caused by rioting).

Against this background of prisoner cases, the court holds that defendants in this case are entitled to the qualified immunity defense. Plaintiff has failed to properly allege the violation of a clearly established right—indeed, of any constitutional right at all. As previously discussed, plaintiff's due process claims cannot withstand dismissal since there is no liberty interest in an inmate's housing status at the D.C. Detention Facility. Plaintiff has thereby failed to satisfy the necessary threshold inquiry—the violation of a constitutional right—in the determination of defendants' qualified immunity claim. Therefore, defendants are entitled to imme-

---

**6.** In light of this conclusion that plaintiff has failed to identify a liberty interest, the court does not reach the question of whether he received adequate due process under the Constitution.

diate dismissal prior to the commencement of discovery. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

For purposes of this analysis, even assuming that plaintiff could properly allege a due process violation, he would still be unable to overcome defendants' qualified immunity claim. As discussed, the second half of the two-part qualified immunity analysis focuses on whether or not the constitutional rights were clearly established at the time of the violation, such that defendants knew or should have known that their conduct was wrongful. The Supreme Court has not defined the specific manner in which rights become clearly established. Still, the court finds that plaintiff's constitutional rights were certainly not "clearly established" in this case. A vacated split decision is the closest any court in this circuit has come to establishing a liberty interest in internal prison regulations. Therefore, defendants are entitled to the qualified immunity defense regardless of the court's ruling on the existence of a liberty interest.[7]

### C. *Personal Involvement of High–Level Defendants*

██ Defendants' final contention is that the claims against defendants Henderson, Britton, and Fulton should be dismissed because the complaint fails to establish their personal involvement in the conduct at issue. They claim plaintiff has not shown any link between the alleged constitutional infringement and the actions of these managing officials.

Plaintiff's amended complaint, with respect to defendants Britton and Fulton, effectively alleges a *respondeat superior* theory. But this doctrine is not a sufficient basis for a valid claim here. Plaintiff must do more than make mere inferences to the involvement of a named defendant in a section 1983 claim, especially when that defendant is a government official. A complaint must specifically allege the involvement of each individual defendant, not rest on the "bare assumption that policy decisions made [elsewhere] might have affected [plaintiff's] treatment in [the detention facility]." *Cameron v. Thornburgh,* 983 F.2d 253, 258 (D.C.Cir. 1993).

The complaint fails to make the required factual averment as to the individual involvement of defendants Britton and Fulton. Accordingly, these defendants will be dismissed.

Defendant Henderson, on the other hand, has been specifically implicated in this case. Plaintiff alleges that Administrator Henderson failed to respond to plaintiff's appeals and grievances of the Adjustment Board's decisions, in violation of the Service Order. These allegations show sufficient personal involvement by Henderson to prevent his dismissal.[8]

### IV. *Conclusion*

For the foregoing reasons, defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment shall be GRANTED with respect to all defendants, in a separate order issued this date.

### *ORDER*

This matter comes before the court on defendants' motion to dismiss plaintiff's complaint for failure to state a claim upon which

---

7. This circuit has established a "heightened pleading" standard for plaintiffs who sue government officials and assert unconstitutional motive. *Kimberlin v. Quinlan,* 6 F.3d 789, 793 (D.C.Cir. 1993). Under this standard, a plaintiff is required to plead specific direct evidence of intent in order to defeat a motion to dismiss based on the qualified immunity defense. *Id.* at 793–94. That is, mere inferential or circumstantial support for plaintiff's allegations will not suffice; rather, direct evidence that the officials' actions were improperly motivated must be pleaded if the case is to reach discovery. *Id.* at 795.

The court does not need to address the question of whether plaintiff has met the heightened pleading standard in this case because, as discussed, his complaint does not properly allege any constitutional violation whatsoever. This case requires dismissal even without consideration of the heightened pleading standard.

8. Of course, this conclusion is not material because defendant Henderson will still be dismissed on other grounds (lack of liberty interest and qualified immunity), along with all other defendants in this case.

relief can be granted or, in the alternative, for summary judgment. Upon consideration of the parties' filings and the relevant law, it is hereby ORDERED:

1. Defendants' motion to dismiss the amended complaint or, in the alternative, for summary judgment, is GRANTED for the reasons set forth in the accompanying memorandum;

2. This case now stands DISMISSED WITH PREJUDICE.

SO ORDERED.