Lawrence CALDWELL, Plaintiff,

v.

Cedric HAMMONDS, et
al., Defendants.

No. Civ.A. 97–2405(GK).

United States District Court,
District of Columbia.

March 31, 1999.

Lawrence D. Caldwell, Lorton, VA, plaintiff pro se.

Michael Alan Stern, Assistant Corporation Counsel, Washington, D.C., for the defendants.

### MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiff, a D.C. prisoner, filed this Complaint *pro se*, seeking damages from the District of Columbia and several employ-

ees of its Department of Corrections for injuries suffered as a result of allegedly unconstitutional actions in violation of the Civil Rights Act, 42 U.S.C. § 1983. The Defendants have moved to dismiss the complaint or, alternatively, for summary judgment. The parties have filed supplemental pleadings and have submitted various documents in support of their positions.

Plaintiff's verified Complaint contains essentially four claims: first, that the conditions in Cell Block 3 at the Maximum Security Facility ("Maximum") at Lorton are so outrageous as to constitute a violation of the Eighth Amendment; second, that the procedures under which he was transferred to that cellblock, and his attempts to appeal the transfer, were racially motivated in violation of his Fifth Amendment right to due process and equal protection; third, that the limitations on use of legal materials by prisoners housed in Cell Block 3 violate his right of access to the courts; and fourth, that the Defendants displayed deliberate indifference to his right to medical treatment for skin cancer and other illnesses he suffered as a result of the conditions prevalent in Cell Block 3.

The Defendants' motion is based on three grounds: that the complaint fails to state a claim against the District of Columbia for municipal liability; that the individual Defendants are entitled to qualified immunity from suit; and, finally, that Plaintiff has failed to state a claim for relief against the Defendants based on any "known constitutional right". Although the Defendants have moved in the alternative for summary judgment, they have not submitted any affidavits or verified exhibits to controvert the allegations of the Complaint. Consequently, Defendants' motion will be treated as a motion to dismiss, not as a motion for summary judgment. On consideration of all the pleadings, the applicable case law, and the entire record herein, the motion to dismiss Count V will be granted. In all other respects the motion to dismiss or for summary judgment will be denied. Counsel will be appointed to represent Plaintiff.

### I. The allegations of the Complaint.

Plaintiff, of Irish–American heritage, is serving a sentence of 20 years to life for a violation of the District of Columbia Code committed in May, 1971. Since 1994, Plaintiff has been incarcerated at the Lorton Reformatory. In addition to the District of Columbia, Plaintiff names as Defendants, in their individual capacities, Cedric Hammonds, Unit Manager of Cell Block 6 at the Maximum at Lorton; Dale Schultz, Staff Psychologist at Maximum; Irma Brady, Chief of Classification and Parole, at Maximum; Belinda Watson Barney, Acting Warden of Maximum, and Adrienne Poteat, Acting Deputy Director for Institutions for the District of Columbia Department of Corrections. All individual Defendants except Schultz are African–American. Plaintiff alleges that the Defendants are responsible for following "clearly established constitutional, statutory, and local law" including the Lorton Act (28 D.C.Mun.Reg. §§ 500–531). Moreover, he alleges, Defendants Barney and Poteat are responsible for directing their subordinates so as to correct "obvious violations of law brought to [their] attention through personal observation or verbal or written notice". (Cpt.¶¶ 2–8).

Plaintiff alleges that the Maximum Security Facility "is among the nation's most wretched, antiquated, dungeon-like prisons of its kind". It is, he contends, "a particularly hostile racial environment for a Caucasian prisoner such as Plaintiff". The inmates at Maximum are the "most violent and agressive [sic] inmates" and a majority are on lock-down status. The heating and ventilation systems "are in extremely poor condition" and there is no ventilation system in some of the housing units. (Cpt.¶ 9).

On May 6, 1997, Plaintiff was transferred to Maximum from the Medium Security Facility ("Medium") and placed in a

control cell on Cell Block 6. (Cpt.¶ 10). Two days later, without written notice of a hearing, he was brought before Defendants Hammonds, Schultz, and Brady. He was advised by Hammonds that the hearing was to "classify" him within Cell Block 6. Hammonds told Plaintiff that he did not require counsel and that he should sign a waiver of the right to counsel to expedite his hearing. (Cpt.¶ 11). However, as soon as Plaintiff signed the waiver, Hammonds announced without consultation with Brady or Schultz that Plaintiff would be placed in Cell Block 3 ("CB 3"), the disciplinary unit. Plaintiff alleges that these Defendants "purposely misled [him] so that he would waive his right to representation and to call witnesses pursuant to" the Lorton Act. (Cpt.¶ 11).

Plaintiff immediately protested that because the purpose of the hearing had been changed, he should be allowed counsel. He was not allowed to revoke his waiver. Plaintiff had been told the hearing was not related to the situation that had caused his transfer from Medium to Maximum. However, Hammonds told him that he was being placed in the disciplinary unit because he had been found in possession of "major contraband" at Medium. (Cpt.¶ 11). Schultz confirmed that the suicide/psychiatric unit was in Cell Block 3, but assured Plaintiff that it was only one of four tiers, and that he would not be on that tier. In fact, Plaintiff was placed on the suicide/psychiatric tier. (Cpt.¶ 11). Plaintiff alleges that these actions were based on a discriminatory racial animus, and were purposely designed to deprive him of his rights under the Lorton Act and to place him in a unit where they knew he "would be exposed to the most physically dangerous and psychologically stressful environment available". (Cpt.¶ 11).

Plaintiff submitted an appeal to Defendant Barney, which was returned as being on the wrong form. He submitted a second appeal, by letter rather than on a form, which was returned ostensibly because it again was on the same wrong form. He submitted the appeal a third time but at the time suit was filed in October, 1997, this Defendant had taken no action on the appeal. (Cpt.¶ 12).

When Plaintiff was moved to Cell Block 3, in a cell on the lower level, the suicide/psychiatric watch tier, he was received by the other residents with various epithets, which were both racial and derogatory names used for police informants. He was threatened with bodily harm and sexual attack. Staff employed in the unit heard these threats. (Cpt.¶ 13).

Paragraphs 14,[1] 15, 16, 17, 18, 19, 20, 23, 24, 27, 28, 29, and 30 contain allegations of grossly unsanitary conditions experienced by Plaintiff while he was housed on Cell Block 3. When he arrived, he found two milk cartons in his cell containing human feces, and fecal matter smeared on the walls. Foul smelling water leaked over the sink. He was refused cleaning materials and his request to repair the leak was ignored. (Cpt.¶ 14(a).)

Many of the mentally ill prisoners on Cell Block 3 do not shower. Others urinate in the shower stalls, which are not cleaned. The unit is infested with flies, cockroaches, and ants in the warmer months. (Cpt.¶ 15). There is no mechanized ventilation in Cell Block 3. More than 99% of the prisoners at Maximum use smoking materials although D.C. law prohibits smoking in government buildings and Cell Block 3 is posted with "No Smoking" signs. The smoking materials are lit with "wicks" of toilet paper which burn for hours. (Cpt.¶ 16.) Plaintiff alleges that on Cell Block 3 he was subjected to more secondary tobacco smoke and particulate matter than in other cellblocks in Maximum because more of the prisoners in that cell block smoke. He alleges that the

1. There are two paragraphs numbered 14. The first will be referred to as "14(a)" and the second as "14(b)".

failure of staff to implement the no smoking policy "is so widespread, of long duration, pattern, practice, and routine as to constitute a policy which has significantly put [his] health and well being at risk". (Cpt.¶ 33).

On May 15, 1997, two inmates in the cellblock were "maced" by staff. The staff refused to open windows. Plaintiff's lungs, eyes, and nasal passages "were irritated severely" by the gas, which lingered for at least 20 minutes. (Cpt.¶ 17). Five days later, a fire was started in an upper level cell, causing smoke and debris which lingered in the air; staff did not attempt to disburse the smoke. (Cpt.¶ 18.) The next day, another fire was set on the upper level tier. Prisoners on the upper level flooded the lower level by plugging their toilets so they overflowed. The flooding continued for the next three days. Prisoners urinated and threw feces into the water. Between ¼ and ½ inch of waste material accumulated on the floor of Plaintiff's cell. The staff made no effort to clean the water until May 26, and refused to allow the prisoners cleaning materials such as mops and brooms. Plaintiff alleges that the failure to clean this water that the staff "knew was contaminated with human waste show willful, malicious, and deliberate indifference to the health and safety of Plaintiff". (Cpt.¶ 19). Fires were set in the cellblock on June 2, June 21, and June 27. Each time staff waited before bringing air evacuation fans onto the tiers. As a result, Plaintiff alleges, he suffered from smoke inhalation, his nostrils being "coated with black soot and other particulate matter" causing adverse effects on his eyes, throat, and lungs. On June 27 he requested and was refused medical treatment. (Cpt.¶¶ 20, 24, 27). On June 27, there was additional flooding from the upper level, which brought more contaminated water into Plaintiff's cell. (Cpt.¶ 27.)

On June 12, the staff allowed two inmates to throw feces and urine on each other and throughout the lower level tier. Staff joked about this and cooperated in this activity by releasing the inmates from their cells to participate in the process. Staff refused to allow the area to be cleaned. The "overwhelming" smell of feces remained on the tier through the evening meal. When the area was finally cleaned, only warm water was used, rather than disinfectant. (Cpt.¶ 23.)

On July 1, prisoners in two upper level cells threw feces during the serving of breakfast. No effort was made to clean the area until after the meal was served. (Cpt.¶ 28.) Ten days later, a prisoner in a lower level cell threw feces on an inmate orderly serving the evening meal. Staff used mace to subdue the prisoner, filling the air with gas which made breathing very difficult. No fans were used to clear the air. The feces were cleaned only after the food trays had been distributed, and then only with warm water rather than disinfectant. (Cpt.¶ 29.)

In Cell Block 3, Plaintiff was never given cleaning supplies for his own cell or laundry detergent for washing clothes. The mop heads which are used to mop-up feces and urine are never changed. (Cpt.¶ 31.) The staff allegedly allows inmate orderlies to regulate use of the automatic clothes washing machine located in the upstairs dayroom. He alleges that he was discriminated against because of his race with respect to use of the machine, by the inmate orderlies with the knowledge of the staff. (Cpt.¶ 21.)

In addition to these allegations of unsanitary conditions, Plaintiff alleges that the cell in which he was housed violated American Correctional Association standards. Of particular significance to him is the fact that the bunk is shorter than he is, which forced him to sleep in a contorted fashion which "exacerbated pain in a medically documented lower and upper back condition". (Cpt.¶ 14(b)). Bunks in other cellblocks are longer than the bunks in Cell Block 3, which Plaintiff alleges indicates a "conscious design to inflict discomfort and pain on any prisoner" in Cell Block 3 who is more than 6 feet tall (Cpt.¶ 33). While

in Cell Block 3, he was allowed out of his cell only 10 hours a month: two one hour recreation periods each week, one 10 minute shower a week, and one 20 minute telephone period a week. He alleges that this confinement constituted cruel and unusual punishment. (Cpt.¶ 14(b)).

Because of the lack of ventilation in Cell Block 3, Plaintiff alleges, his cell became dangerously overheated on 19 days between June 21 and August 17, 1997. As a result, he suffered heat prostration, including mental disorientation, dehydration, nausea, shortness of breath, and a heat rash on his face. He was refused medical treatment for these problems. (Cpt.¶ 30).

Also supporting his claim that Defendants were deliberately indifferent to his need for medical care, Plaintiff alleges that on June 26, 1997, the consulting dermatologist, Dr. Romeo, diagnosed basal cell cancer in two locations on his face, which he directed should be removed within two weeks by cryosurgery. Despite several telephone calls to the Chief Medical Officer by an attorney with the Public Defender Service, the surgery still had not been performed by the time the complaint was filed three months later. (Cpt.¶ 25.)

When he was transferred to Maximum on May 6, Plaintiff had two actions pending in this Court. He alleges that he was handicapped in litigating these cases, particularly one in which he was acting *pro se*, because there "is inadequate access to" legal materials, typewriters, and copying services at Maximum. This denial of adequate access to law library facilities is, he alleges, of such long duration as to constitute a policy of Defendant District of Columbia "to knowingly impede inmates' access to the courts". (Cpt.¶ 35).

Although the Lorton Act requires 30 day reviews of housing decisions, Plaintiff's placement in Cell Block 3 was not reviewed until July 31, 1997, almost 90 days after the placement. He alleges that a recommendation that he be removed from the "High Security/Special Handling" designation was not implemented until August 20, after his lawyer contacted the new Warden. Plaintiff alleges that this delay in moving him was caused by an invidious discriminatory racial animus on the part of the African–American staff. (Cpt.¶ 32).

Plaintiff alleges that all Defendants were aware of the conditions that existed in Cell Block 3, Defendants Hammonds and Brady because of their long tenure at Maximum, Defendant Schultz through her attendance on mentally ill prisoners on the lower level tier in Cell Block 3, and Defendants Barney and Poteat through periodic visits to Cell Block 3, including a specific visit on June 9 (Cpt.¶¶ 22, 26). He alleges that the conditions described at Cell Block 3 "are so serious, of long duration, and extensive" that they "exhibit a pattern, practice, and routine which constitutes a policy by Defendant District of Columbia to inflict cruel and unusual punishments on prisoners who are confined in that unit". (Cpt.¶ 36). Moreover, Plaintiff claims, the refusal of the Maximum staff "knowingly, maliciously, and obdurately ... to properly implement the requirements of the Lorton Act is so widespread, extensive, of long duration, pattern, practice, and routine as to constitute a policy by Defendant District of Columbia to violate prisoners' right to due process and equal protection". (Cpt.¶ 37).

Plaintiff alleges that the failure of Defendants Barney and Poteat "to properly respond" to inmates' requests for administrative remedies "in concert with other agents of Defendant District of Columbia is so widespread, of long duration, pattern, practice, and routine as to constitute a policy to knowingly violate such inmates' right to due process and equal protection ...". (Cpt.¶ 34).

Plaintiff states six claims based on the above allegations. Count I claims that Defendants Hammonds, Brady, Barney, and Poteat individually and in concert acted willfully, recklessly, and maliciously with an invidious discriminatory racial animus to deny Plaintiff's right to equal pro-

tection under the Fifth Amendment. He alleges that Defendant Schultz "condoned and aided in the acts and omissions" of the other individual Defendants to deny Plaintiff's right to equal protection. (Cpt.¶ 38.)

Count II alleges that Defendants Hammonds, Schultz, and Brady individually and in concert knowingly failed to adhere to the requirements of the Lorton Act, denying Plaintiff his right to due process under the Fifth Amendment, and that Defendant Barney condoned and aided in this by "purposely failing to accept and consider Plaintiff's written appeal concerning" the May 8 hearing. (Cpt.¶ 39.)

Count III, against all Defendants, alleges that the conditions described in Cell Block 3 violated Plaintiff's right to be free from cruel and unusual punishment under the Eighth Amendment. (Cpt.¶ 40).

Count IV alleges that the acts and omission of the District of Columbia's agents, employees, and decision makers in failing to provide timely medical treatment and a safe institution without exposure to secondary smoke and other health threatening air pollutants "show deliberate indifference" in violation of the Eighth Amendment. (Cpt.¶ 41).

Count V names the District of Columbia and alleges a violation of Plaintiff's right of access to the courts by failing to provide adequate access to law library facilities to prisoners confined in segregation units at Maximum, in violation of the First Amendment right of access to the courts (Cpt.¶ 42(a).) [2]

Count VI charges Defendants Barney and Poteat with violating Plaintiff's right to due process and equal protection under the Fifth Amendment by failing to accept and consider his administrative remedies relating to the issues described in the complaint. (Cpt.¶ 42(b).).

Plaintiff seeks a declaration that his rights have been violated, $10,000 in compensatory and $50,000 in punitive damages from each individual Defendant, $100,000 in compensatory and $500,000 in punitive damages from the District of Columbia, and a direction that there be no retaliation against him for the filing of this action.

## II. Analysis

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief". *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In ruling on a motion to dismiss for failure to state a claim, the factual allegations of the complaint must be presumed true and construed liberally in favor of the plaintiff. *Shear v. National Rifle Ass'n*, 606 F.2d 1251, 1253 (D.C.Cir. 1979).

### A. Liability of the District of Columbia

■ Defendants contend that the District of Columbia can not be liable because Plaintiff has not alleged any constitutional violation which a policymaker established or was aware of and ignored. They point out that under *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), an individual bringing a Civil Rights Act claim against a municipality must show that "action pursuant to official municipal policy of some nature caused a constitutional tort". *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. The identity of the "officials or governmental bodies who speak with final policymaking authority for the local governmental actor" in connection with the particular constitutional violation at issue is a question of state law. *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). *Accord, St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

Defendants argue that only the Mayor, City Council, and Director of the Department of Corrections can establish "official

**2.** There are two paragraphs numbered 42, which will be denominated 42(a) and 42(b).

municipal policy" for the D.C. Department of Corrections, relying essentially on what is only dictum in *Triplett v. District of Columbia,* 108 F.3d 1450 (D.C.Cir.1997). In *Triplett,* a prisoner sued the District for injuries inflicted by two correctional officers. There was testimony that "supervisors", an unnamed sergeant and a Lieutenant King, knew of the alleged practice of using excessive force. The Circuit Court reversed a finding of liability, stating that "[t]here is no one in this case's cast of characters who could possibly be said to hold 'final policymaking authority' regarding the use of force in restraining prisoners,". *Triplett,* 108 F.3d at 1453. It was in this context only that the Court noted that there was no proof that "the Director, the Mayor or the City Council knew of or disregarded a practice of excessive force ...". *Triplett,* 108 F.3d at 1453. No case from our Court of Appeals holds, as a matter of law, that only the Mayor, the City Council, and the Director of the Department of Corrections can be final policymakers.

### 1. Count III—Eighth Amendment claim—unhealthy conditions in Cell Block 3

■ In *Jett* the Supreme Court "left open the possibility of liability where final policymakers 'acquiesce[d] in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity'". *See Triplett,* 108 F.3d at 1454, quoting *Jett,* 491 U.S. at 737, 109 S.Ct. 2702. In the instant case, Plaintiff's verified complaint alleges facts from which a jury might easily conclude that the unsanitary and unhealthy conditions in Cell Block 3 (including fires, floods, feces and urine contaminating the cells, and secondhand tobacco smoke) existed for such a long time and were so obvious to any observer that the policymakers for the Department of Corrections either acquiesced in those conditions or abandoned their responsibilities as policymakers to individuals such as the Acting Deputy Director for Institutions (De-

fendant Poteat) or the Acting Warden (Defendant Barney). Moreover, Plaintiff submitted with his complaint a copy of an administrative appeal to Margaret Moore, then Director of the Department of Corrections, dated July 1, 1997, enclosing the appeal he had submitted to Barney raising the conditions of confinement issues alleged in the complaint. This suggests that the Director did have notice of the particular conditions about which Plaintiff complains in this case.

Plaintiff's allegations, which must be accepted as true for purposes of the motion to dismiss, describe "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see Brown v. Plaut,* 131 F.3d 163 (D.C.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2346, 141 L.Ed.2d 716 (1998); *Williams v. Adams,* 935 F.2d 960 (8th Cir.1991). Accordingly, Plaintiff has set forth a claim for violation of his right to be free from cruel and unusual punishment under the Eighth Amendment. Defendants have not submitted any affidavits disputing Plaintiff's allegations. Therefore the District of Columbia's motion to dismiss Count III will be denied.

### 2. Count IV—Eighth Amendment claim—denial of medical treatment.

■ In Count IV, Plaintiff claims that the agents and decision makers of the District of Columbia violated his rights under the Eighth Amendment by "deliberate indifference" to his need for medical treatment and by failing to provide an institution free from pollution by airborne contaminants, including tobacco smoke. In *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), holding that deliberate indifference to an inmate's medical needs is cruel and unusual punishment, the Supreme Court pointed out that "[a]n inmate must rely on prison authorities to treat his medical needs; if the

authorities fail to do so, those needs will not be met."

Plaintiff alleges that prescribed treatment for skin cancer was delayed, with the result that the cancer spread. He also alleges that in Cell Block 3 he was continuously exposed to secondary tobacco smoke and to smoke from fires that were set either with or without the connivance of staff. Such allegations state a claim for "deliberate indifference" by failing to provide a place of confinement free from harmful contaminants. *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Defendants argue that the policy of the District of Columbia prohibits smoking in the prisons, citing the statement in *Helling* that the adoption of a policy against smoking "will bear heavily on the inquiry into deliberate indifference". However, the policy in *Helling* was adopted while that litigation was pending, which suggests that the authorities in that jurisdiction were open to being educated about the dangers of cigarette smoke. In the instant case, Plaintiff has submitted a copy of the list of articles available for purchase at the canteen, which includes cigarettes and cigars. (Cpt., Ex. 5). Moreover, Plaintiff has alleged that the correctional officers permitted smoking in the cell block. A reasonable juror could conclude that the prison officials expected purchasers of these articles to use them, in flagrant violation of the official policy against smoking.[3] Governments can not adopt a "policy" that is plainly ignored and then claim that violations are not officially sanctioned and therefore not actionable. The motion to dismiss Count IV will be denied.

### 3. Count V—First Amendment claim—denial of access to the law library.

■ In Count V, Plaintiff alleges that the limited access to legal materials provided to prisoners in Maximum, particularly Cell Block 3, handicapped him in responding to orders in two cases pending in this Court, in one of which he was acting *pro se.* Plaintiff does not allege any specific injury as a result of the limited access to legal materials. Therefore, this count does not state a constitutional violation. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The Defendant's motion to dismiss Count V will be granted.

### B. Liability of Individual Defendants

■ As a general rule, government officials may be sued in their individual capacities for constitutional violations only if they are directly responsible for the alleged violations. Theories of *respondeat superior* and vicarious liability do not result in imposition of liability under Section 1983. *Farmer v. Moritsugu,* 163 F.3d 610, 616 (D.C.Cir.1998); *Meyer v. Reno,* 911 F.Supp. 11, 14 (D.D.C.1996); *Price v. Kelly,* 847 F.Supp. 163, 169 (D.D.C.1994), *aff'd,* 56 F.3d 1531, 1995 WL 364510 (D.C.Cir.1995). However, a "failure to supervise and involvement with a practice or policy pursuant to which subordinates violate the rights of a Plaintiff [can] provide adequate bases for constitutional claims against supervisory personnel". *Fludd v. United States Secret Service,* 102 F.R.D. 803, 806 (D.D.C.1984) (and cases cited). *See also Haynesworth v. Miller,* 820 F.2d 1245, 1263 ("Governmental officials may also be held personally liable in damages for constitutional infringements resulting

---

**3.** The District Court's ruling for the plaintiffs in *Scott v. District of Columbia,* 139 F.3d 940 (D.C.Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 125, 142 L.Ed.2d 101 (1998), was reversed because the plaintiffs had not produced sufficient evidence that the levels of smoke in the Medium Security Facility at Lorton were unreasonably high and unhealthy, and because the prison officials were seen to have been attempting to enforce a nonsmoking policy. Prisoners in Cell Block 3 at Maximum have no access to outdoor recreation (Cpt., ¶ 31); all smoking must be done in the cell block. The Court cannot conclude at this early stage of the instant case that Plaintiff will not be able to produce evidence to prove the allegations of his complaint relating to conditions at Maximum.

from their establishment of unconstitutional policies".)

### 1. Qualified immunity

■ Qualified immunity protects an official from suits for damages in the performance of discretionary duties unless the official " 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury ...' " *Harlow v. Fitzgerald,* 457 U.S. 800, 813, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (*quoting Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)). *Accord, Brogsdale v. Barry,* 926 F.2d 1184, 1189 (D.C.Cir.1991). Evidence of improper motive is irrelevant to the defense of qualified immunity, although it may be an essential element of Plaintiff's case. *Crawford–El,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), *rev'g,* 93 F.3d 813 (D.C.Cir.1996).[4]

Plaintiff's claims against the individual Defendants are first, that Defendants Hammonds, Brady, and Schultz purposely transferred him to Cell Block 3 because he is Caucasian, knowing of the conditions in that cellblock and knowing that he was not mentally ill; second, that the procedure these Defendants used to transfer him to that cellblock violated the Lorton Act and due process; third, that the conditions in Cell Block 3 were inhumane and unhealthy and therefore violated Plaintiff's Eighth Amendment rights; and fourth, that Defendants Barney and Poteat violated his right to due process and equal protection by purposely ignoring his grievances based on the transfer and conditions within Cell Block 3.

### 2. Transfer to Cell Block 3

■ Defendants assert that Plaintiff fails to state a claim because he is not entitled to a particular classification within the prison. However, Plaintiff does not challenge his transfer to Maximum. Rather, his complaint is that the decision to house him in the cellblock at Maximum which housed mentally ill individuals whose behavior caused intolerable conditions, when he was not mentally ill, was not for a valid penological reason but instead was for the unacceptable reason of his race.[5] Plaintiff may prevail if he can demonstrate that the Defendants treated him differently from others in similar circumstances, without any rational relationship to a legitimate penological purpose and because of purposeful or intentional discrimination. *See Tucker v. Branker,* 142 F.3d 1294, 1300 (D.C.Cir.1998); *Brandon v. DC Board of Parole,* 823 F.2d 644, 650 (D.C.Cir.1987); *Marshall v. Reno,* 915 F.Supp. 426, 432 (D.D.C.1996). A housing transfer based only on the race of the individual certainly would violate clearly established constitutional law, as any reasonable correctional officer or prison psychologist knew or should have known. *See Anyanwutaku v. Moore,* 151 F.3d 1053, 1058 (D.C.Cir.1998).

■ The Defendants contend that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), Plaintiff cannot challenge the procedures under which he was placed in Cell Block 3. Generally

---

**4.** In opposing a "properly supported" dispositive motion, a plaintiff cannot rely on "general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive". *Crawford–El,* 118 S.Ct. at 1598. Here, Defendants have not filed such a "properly supported" dispositive motion, since they have not offered any affidavits or other verified exhibits in support of their motion for summary judgment. Plaintiff's Com-

plaint and his Statement of Disputed Material Facts are verified, which would satisfy the requirement that affidavits be submitted in opposition to a motion for summary judgment.

**5.** Plaintiff has submitted a statement from Dr. Roemer, staff psychiatrist, who met with him during the time he was lodged on Cell Block 3 and confirmed that he was not mentally ill.

the liberty interests of prisoners which are protected by the due process clause are

> limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin,* 515 U.S. at 483, 115 S.Ct. 2293. However, the Court noted that the disciplinary segregation imposed on Sandin "with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody", *i.e.,* inmates who were not being punished. *Ibid.* His placement "did not work a major disruption in his environment". *Ibid.* In the instant case, on the other hand, Plaintiff alleges that the conditions to which he was subjected in Cell Block 3 were dramatically different from those which he experienced even in Cell Block 6 at Maximum. Moreover, Plaintiff indicates that because Cell Block 3 was the cellblock that housed mentally ill and suicidal inmates, placement in that cellblock carried a stigma qualitatively different from the stigma attached to imprisonment alone. *Cf. Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (minimum procedures necessary before prisoner can be transferred to a mental hospital). Plaintiff alleges that there was no legitimate reason why he should be housed in Cell Block 3, and that Defendants purposely transferred him to that location because of his race. A transfer for such a reason would violate clearly established constitutional law, as the Defendants knew or should have known. In that event, or if the transfer to that particular cellblock was made "with the malicious intention to cause a deprivation of constitutional rights or other injury",[6] Defendants would not be entitled to the protection of qualified immunity.

Count II alleges that the procedures used in transferring Plaintiff to Cell Block 3 and in refusing to consider his appeal violated the Lorton Act, *see Abdullah v. Roach,* 668 A.2d 801 (D.C.App.1995). This Court has supplementary jurisdiction over this claim under 28 U.S.C. § 1367. The motion to dismiss Counts I and II will be denied.

### 3. Conditions on Cell Block 3

■ Plaintiff's verified complaint describes intolerable conditions on Cell Block 3, conditions which, if proven, would violate a "clearly established" constitutional right to be free from cruel and unusual punishment. Attached to the complaint is an affidavit from Vincent Wilkins, staff attorney at the Public Defender Service, who met with Plaintiff regularly in the "Day Room" in Cell Block 3 from approximately May 8, 1997, until about August 20, 1998. Mr. Wilkins confirms that the heat during July and August was such that he had to terminate his visits early, and that the odor at Cell Block 3 was always offensive, so much so that twice he because nauseated and had to terminate his interviews with Plaintiff before he became ill.

■ The Eighth Amendment protects prisoners from the "wanton and unnecessary infliction of pain" and from conditions that are "grossly disproportionate to the severity of the crime warranting imprisonment". *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). *Accord, Brogsdale,* 926 F.2d at 1191. Surely any correctional officer (indeed, any citizen) would know that it is cruel and unusual, and outside the usual inconveniences of prison life, to require Plaintiff to live more than 23 hours a day and to eat in a cell contaminated by other inmates' feces and urine, where smoke from tobacco and other contaminants fills the air, and where smoke from fires and mace is allowed to linger. *See, e.g., Blissett v. Coughlin,* 66 F.3d 531 (2d Cir.1995); *Goodson v. City of Atlanta,* 763 F.2d 1381 (11th Cir.1985).

**6.** *Harlow,* 457 U.S. at 813, 102 S.Ct. 2727.

The decision to house Plaintiff in Cell Block 3 at Maximum placed him in a cellblock which he alleges, in vivid detail, "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life". *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293. Any correctional officer and any reasonable prison administrator must know that housing a prisoner in such conditions of confinement would violate the Eighth Amendment prohibition against cruel and unusual punishment.

Plaintiff states that Defendants Hammonds, Brady, and Schultz, had sufficient contact with the Maximum Security facility that they were aware of the conditions on that cellblock, and that Barney (the Warden of the institution) and Poteat (Acting Deputy Director for Institutions) also knew of those conditions. Plaintiff alleges in Counts I, II, and III actions by Defendants Hammonds, Brady, and Schultz personally which, if proven, violated his right to be free from cruel and unconstitutional punishment. He also alleges that Defendants Barney and Poteat knew of and sanctioned the unconstitutional conditions into which he was thrust by the other individual Defendants. The allegations of the Complaint, which are assumed to be true at this stage of the proceedings, set forth facts from which a reasonable juror could conclude that the individual Defendants knew or should have known that their actions violated Plaintiff's clearly established constitutional rights. If Plaintiff can prove the allegations of his Complaint, the Defendants would not be entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The motion of the individual Defendants to dismiss Count III, the Eighth Amendment claim, will be denied.

#### 4. Failure of Barney and Poteat to act on grievances.

 Count VI charges Defendants Barney and Poteat with violating Plaintiff's rights to due process and equal protection by "failing to accept and consider" his administrative remedies. The failure to follow prison grievance procedures does not constitute a federal constitutional violation. *Crosby–Bey v. District of Columbia*, 786 F.2d 1182, 1186 (D.C.Cir.1986); *Pryor–El v. Kelly*, 892 F.Supp. 261, 275 (D.D.C.1995); *Spencer v. Moore*, 638 F.Supp. 315 (E.D.Mo.1986); *Brown v. Dodson*, 863 F.Supp. 284 (W.D.Va.1994). However, 28 U.S.C. § 1367 gives this Court jurisdiction over Plaintiff's claim insofar as it is based on a violation of the Lorton Act or other local law. Accordingly, the motion to dismiss Count VI will be denied.

### D. Punitive damages

 Defendants correctly note that punitive damages can not be obtained in a Section 1983 action against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Accordingly, the portion of the complaint that seeks punitive damages from the District of Columbia will be stricken.

An appropriate order will be entered

### ORDER ON MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

For the reasons stated in the Memorandum Opinion filed this day, it is by the Court this 30th day of March, 1999,

**ORDERED** that Defendants' motion to dismiss Count V of the Complaint in this case is **GRANTED,** and it is further

**ORDERED** that in all other respects Defendants' motion to dismiss or for summary judgment is **DENIED,** and it is further

**ORDERED** that the Clerk is directed to appoint an attorney from the Pro Bono Panel of this Court to represent the Plaintiff.