**Robert H. TRIPLETT, Appellee,**

v.

**DISTRICT OF COLUMBIA, Appellant.**

No. 96–7016.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 17, 1997.

Decided March 21, 1997.

Edward E. Schwab, Assistant Corporation Counsel, Washington, DC, argued the cause for appellant. With him on the brief was Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel.

Samuel M. Shapiro, Rockville, MD, argued the cause for appellee. With him on the brief was Patrick J. Christmas.

Before: WILLIAMS, SENTELLE and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Robert H. Triplett sued the District of Columbia for injuries apparently inflicted by two D.C. correctional officers at the city's Occoquan Facility in Lorton, Virginia, where Triplett was serving a 40–year term for armed robbery. Our account of the facts comes entirely from the testimony of plaintiff and his experts. This is because the magistrate judge who tried the case sanctioned the District for discovery abuses, denying it the right to call witnesses; the District has not cited the ruling as error.

On the evening of April 23, 1993, Triplett was sleeping in his bunk during the prisoner count. Officer Watts awakened him, told him that he would be sent to the "hole," i.e., solitary confinement, for obstructing the count (apparently by sleeping) and sent him to the unit office. Watts told Triplett to put out his hands for handcuffing. Triplett protested that Watts lacked authority to send him to the hole, because Lorton regulations allowed only officers with at least the rank of

lieutenant to do so. Watts then enlisted the assistance of Officer Randolph. According to Triplett, Watts "grabbed [his] left arm and began to move it up and twisted it, [and] pulled [his] head down to [Watt's] chest." Appendix ("App") III at 216. Randolph then took Triplett's right arm and twisted it, moved it up the back, and forced his weight against Triplett's back. At this point, Triplett had difficulty breathing, heard something snap and lost consciousness. The something was Triplett's neck. All this occurred without resistance from Triplett.

As a result Triplett required surgery to fuse his cervical vertebrae and spent six weeks in the hospital. According to his medical expert, Triplett has lost some feeling in his left arm and has a weak left hand. In addition, he will likely lose some rotation of the neck and develop arthritis that will further disable him.

The magistrate judge found that the District was liable to Triplett for negligence, for assault and battery, and for use of excessive force in violation of the Eighth Amendment, enforceable under 42 U.S.C. § 1983 (1994). She awarded Triplett $135,000 in compensatory damages, and, pursuant to 42 U.S.C. § 1988 (1994), also awarded attorney's fees for the constitutional violation. We uphold the damage award based upon the assault and battery claim. We need not reach the question of negligence, because the winning assault and battery claim alone sustains the damage award. We reverse the finding of liability under § 1983 and the resulting award of attorney's fees.

*Assault and Battery*

Before the magistrate judge the District defended against the assault and battery claim with the argument that the officers were not acting within the scope of their employment. Its proposed findings of fact seemed to argue that this could be inferred from the fact that they used excessive force. App. I at 50–51 (citing expert testimony that "under the circumstances later testified to by plaintiff, *no* amount of force was called for or required" to handle Triplett) (emphasis added). The magistrate judge found that the officers were acting within the scope of their employment, and the District does not appeal on this point.

Instead the District here takes what seems to be the opposite tack, arguing that the force used by the officers was reasonable and therefore did not constitute battery under District of Columbia law. It is something of a stretch to find that the District preserved the argument. The best that can be said for the District is that its pretrial statement asserted that the force used was reasonable, and its later proposed findings of fact and conclusions of law contained oblique hints of the same theory, such as a reference to the "alleged use of excessive force." App. I at 53.

In any event, even if the District had properly preserved the issue, we would uphold the magistrate judge's finding. Whether the officers' use of force was excessive is a factual one, to be overturned only if clearly erroneous. Triplett's testimony as to his lack of resistance, the amount of force inflicted by the officers and the seriousness of the resulting injury are enough to sustain the lower court's determination.

The District suggests that the court below erroneously applied a standard of "excessive force," rather than the more demanding standard of "clearly excessive force" set forth in *Jackson v. District of Columbia,* 412 A.2d 948, 955–56 (D.C.1980), which in turn relied on the Restatement (Second) of Torts, § 132, comment a (1965). It is not altogether clear whether the *Jackson* standard applies generally or is limited to assault cases "not involving a battery," because in such cases there is no "evidence of physical injury . . . to aid the fact finder." See *Jackson,* 412 A.2d at 956 n. 17; see also *Gabrou v. May Department Stores Co.,* 462 A.2d 1102, 1104–05 & n. 4 (D.C.1983) (employing a standard of "force above and beyond that necessary to maintain a lawful arrest" for an alleged battery by an officer, but citing *Jackson* for proposition that burden would be higher for an assault claim). Because the District failed to raise the issue before the magistrate judge, however, we need not resolve the question. Thus we uphold the magistrate judge's ruling.

*Eighth Amendment*

The magistrate judge found that the District followed a policy and practice of using

excessive force on prison inmates in violation of the Eighth Amendment. She rested her conclusion on the testimony of one Kenneth Gunn, who had been employed as a D.C. correctional officer for nine years but who at the time of this trial was himself serving a prison sentence—for using excessive force on a D.C. prisoner. Gunn testified that during his nine years he had used excessive force a total of three times and had seen other officers do the same three to four times. (His estimate of the total number of times he observed other officers use excessive force was the same for the full nine years as for the two years at Occoquan.) He also testified that supervisory officers knew of the use of excessive force and had covered up the activity. The testimony about supervisors generally referred to them as that, i.e., "supervisors"; the only references that revealed rank were to an unnamed sergeant and to one Lieutenant King. App. II at 24.

■ Under § 1983 a municipality is liable not under principles of *respondeat superior*, but only for constitutional torts arising from "action pursuant to official municipal policy." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Although *Monell* allows claims based upon a well-settled municipal custom, 436 U.S. at 690–91, 98 S.Ct. at 2035–36, plaintiff must "show fault on the part of the city based on a course its policymakers consciously chose to pursue," *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C.Cir.1986).

■ If an employee's authority to exercise discretion constituted him a "policymaker" for *Monell* purposes, then perhaps the nameless "supervisors" alluded to by Gunn, or even Lieutenant King, might qualify. But the Supreme Court has made clear that the standard is more demanding. "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be ... *respondeat superior* liability," which *Monell* had rejected. *St. Louis v. Praprotnik*, 485 U.S. 112, 126, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (O'Connor, J., plurality opinion). The only acts that count (though they may include inaction giving rise to or endorsing a custom) are ones by a person or persons who have "final policymaking authority [under] state law." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (internal citations and quotations omitted). The issue of final policymaking authority is one of state law. *Id.*

■ There is no one in this case's cast of characters who could possibly be said to hold "final policymaking authority" regarding the use of force in restraining prisoners. The Occoquan prison is run by the D.C. Department of Corrections, which is headed by a Director appointed by the Mayor, who himself is responsible for "the general direction and supervision" of the Department. D.C.Code § 24–442 (1981); see also § 24–441. The Department has the authority to promulgate rules and regulations for these institutions, subject to approval by the District's Council. § 24–442.

Nor is there any evidence that the Director, the Mayor or the City Council knew of or disregarded a practice of excessive force by D.C. correctional officers. In fact, Gunn's testimony suggests otherwise. First, Gunn said that he and his supervisory officers covered up the use of excessive force through falsified disciplinary reports. Cover-up efforts at relatively low levels in the hierarchy not only reduce the likelihood that policymakers will learn of the covert practice, but suggest a belief by the subordinates that their behavior violates established policy.

Second, Gunn testified that he was instructed in his training as a correctional officer "to use a minimum amount of force necessary to restrain an inmate in a hostile situation." App. II at 44. There being no evidence that this was accompanied by winks and nods to the contrary, the testimony suggests that the policymakers intended that District officers abide by the municipality's stated policy. Cf. *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C.Cir.1996) (liability under *Monell* may rest on failure to adequately train city employees, so long as the inadequate training "represent[s] 'city policy'" and reflects "deliberate indifference to the rights" of plaintiffs). Finally, the District's decision to discharge Gunn for using

excessive force undermines any notion that it supported, endorsed or embraced the use of excessive force.

Plaintiff cites *Haynesworth v. Miller*, 820 F.2d 1245 (D.C.Cir.1987), a decision of this court antedating both *Praprotnik* and *Jett*, for the proposition that a "lower-level official" may have "de facto final authority" where "supervisory personnel [fail] to oversee his decisions," or where "subordinate employees ... acquiesce in his directives." *Haynesworth*, 820 F.2d at 1273. In *Haynesworth*, the district court had dismissed a retaliatory prosecution claim, relying on a policy directive against retaliatory prosecution and the dismissal of the charges by supervisory officials. The court reversed, reasoning that the plaintiff could possibly satisfy *Monell* with evidence supporting his allegations that the Chief of the Law Enforcement Section of the Corporation Counsel had policymaking authority and had pursued a policy of retaliatory prosecution. *Id.* at 1274. Here, of course, plaintiff has offered no evidence that holders of final policymaking authority adopted any policy directing or endorsing the behavior of the nameless "supervisors," "Lieutenant King" or Officers Watt and Randolph. Nor has plaintiff offered evidence suggesting that any of them had, through policymakers' neglect, become what *Haynesworth* called "de facto" policymakers.

In addition, *Haynesworth* appears inconsistent with *Praprotnik* and *Jett*. Its statement that "an individual further down the municipal chain of command may as a practical matter possess final authority to exercise judgment in a particular area," as a result of his superiors' failure to supervise, 820 F.2d at 1273, contradicts the *Praprotnik* plurality's statements that "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority," 485 U.S. at 130, 108 S.Ct. at 928, and that "[s]imply going along with discretionary decisions made by one's subordinates ... is not a delegation to them of the authority to make policy," *id.* And *Haynesworth*'s statement that a municipality could be liable under *Monell* if the person engaged in the unlawful activity were acting as the "alter ego" of the municipality, and that such a classification was "a question of fact rather than law," 820 F.2d at 1272, conflicts directly with *Jett*'s characterization of the issue of final authority as "a legal question," 491 U.S. at 737, 109 S.Ct. at 2723–24. See also *Jett v. Dallas Independent School Dist.*, 7 F.3d 1241, 1246 (5th Cir.1993) (noting that delegating authority to apply a discretionary policy differs from delegating authority to make policy).

*Jett* left open the possibility of liability where final policymakers "acquiesce[d] in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." 491 U.S. at 737, 109 S.Ct. at 2724. As we have seen, Gunn's testimony not only fails to show such a custom or acquiescence, but tends to show the opposite.

\* \* \*

We affirm the award of damages based upon the District's liability for assault and battery, but reverse the award of attorney's fees that was based on the finding of liability under § 1983.

*So ordered.*