**Dr. Susan LERNER, Plaintiff,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**No. CIV.A. 00–1590(GK).**

United States District Court, District of Columbia.

March 4, 2005.

Ari Micha Wilkenfeld, Lynne A. Bernabei, Debra S. Katz, Rashida Aune Adams, Bernabei and Katz, PLLC, Washington, DC, for Plaintiff.

Damon A. Pace, E. Louise R. Phillips, Office of Corporation Counsel, D.C., Frederick D. Cooke, Jr., Rubin, Winston, Diercks, Laurie J. Weinstein, United States Attorney's Office, Washington, DC, for Defendants.

### MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiff Susan Lerner, Ph.D., a psychologist employed at St. Elizabeths Hospital[1] in Washington, D.C., brings this action under 42 U.S.C. §§ 1983, 1985(2), 1985(3), and the District of Columbia Whistleblower Act, D.C.Code §§ 1–615.51, *et seq.*, alleging that Defendants, the District of Columbia ("District") and various employees of St. Elizabeths,[2] violated and conspired

---

1. The official name of the institution established in 1855 as the Government Hospital for the Insane is St. Elizabeths Hospital, *not* St. Elizabeth's Hospital.

2. Raymond Patterson, M.D., Director of Forensic Services Administration of the District of Columbia Commission on Mental Health Services; Joseph Henneberry, R.N., St. Elizabeths Hospital Bureau Chief; Ritzia A.

to violate her Constitutional rights guaranteed by the First and Fifth Amendments of the United States Constitution. Specifically, Plaintiff alleges that her superiors transferred her, attempted to blackmail her and prevent her from testifying in court, initiated multiple baseless ethics investigations of her activities, and attempted to terminate her employment—all in retaliation for her recommending the twelve-hour-per-month conditional release of St. Elizabeths patient John W. Hinckley, Jr., agreeing to testify at Hinckley's release hearing, and agreeing to be interviewed for a *New Yorker* article on Hinckley and the threats made against her by her superiors.

This matter is now before the Court on Defendants' Motion for Summary Judgment. Upon consideration of the Motion, Opposition, Reply, Sur-reply, and the entire record herein, and for the reasons stated below, Defendants' Motion for Summary Judgment is **denied.**

## I. BACKGROUND [3]

### A. Factual History

#### 1. Undisputed Facts

Despite Defendants' failure to identify their opposition to or agreement with any of the facts stated below, it appears that the parties are in general agreement about the following:

Plaintiff has an M.S. in Clinical Psychology and a Ph.D. in Social Psychology. She specializes in forensic psychology, and the evaluation and treatment of patients who are involved in legal or adversarial proceedings. Plaintiff suffers from multiple sclerosis ("MS").

In 1985, Plaintiff was hired by Defendants Joseph Henneberry, R.N., St. Elizabeths Hospital Bureau Chief, and Raymond Patterson, M.D., Director of Forensic Services Administration of the District of Columbia Commission on Mental Health Services ("CMHS"), for the position of Clinical Administrator in John Howard Pavillion ("JHP") Ward 6, a medium security ward at St. Elizabeths Hospital ("St. Elizabeths" or "Hospital"). As a Clinical Administrator, Plaintiff ran a clinical ward, headed the ward's treatment team, and served as a liaison between the ward and outside agencies, attorneys, and the Hospital Review Board. Her duties frequently included testifying in court as an expert witness about the patients under her care.

Beginning in 1988, Plaintiff served as the head of the team responsible for treating and monitoring St. Elizabeths patient and Ward 6 resident, John W. Hinckley, Jr.[4]

George, Post–Trial Branch Chief; Robert Benedetti, Ph.D., former Acting Chief of Post–Trial; Elizabeth Teegarden, Ph.D., former Director of the John Howard Pavilion ("JHP") Unit; and John Does One through Ten. (The District of Columbia Commission on Mental Health Services was originally a Defendant, but has since been dismissed from the complaint.)

3. The instant case involves the atypical situation in which the parties moving for summary judgment have proffered a wholly inadequate "Statement of Undisputed Facts" which details none of the material facts of this case. Indeed, there is simply no correlation between Defendants' Statement of Undisputed Facts and the factual allegations of Plaintiff's Second Amended Complaint. Plaintiff, on the other hand, has more than met her obligation under Local Civil Rule 7.1(h) to provide a "Statement of Genuine Issues of Material Facts in Dispute." In light of Defendants' woefully unsatisfactory presentation, the facts set forth herein are taken from Plaintiff's Statement of Genuine Issues of Material Facts in Dispute and from Plaintiff's briefs.

4. On March 30, 1981, Hinckley attempted to assassinate then-President Ronald Reagan in the driveway of the Washington Hilton Hotel; Hinckley shot and wounded the President as

A couple of years earlier, in 1986, Plaintiff's son, Scott Lerner, tested HIV-positive and was diagnosed with bi-polar disorder. In 1991, while Plaintiff was treating and monitoring Hinckley, Scott was hospitalized following a suicide attempt, during which he became extremely distraught over his HIV-positive status and made statements that could be construed as threats against then-President George H.W. Bush. The Secret Service investigated but concluded that Scott posed no threat to the President. Plaintiff alleges that her second-level supervisor, Dr. Thomas Polley, then-Director of Inpatient Services at JHP and later Forensic Services Administrator, told her "that he knew that her son was not a danger to the President, and that there was no problem with her continuing to treat Mr. Hinckley." Pl.'s Opp'n at 10.

In July 1992, Hinckley was moved from Ward 6, a medium security ward, to Ward 2, a minimum security ward.

In August 1994, Plaintiff's supervisors, Defendant Robert Benedetti, Ph.D., then-Acting Chief of Post–Trial, and Defendant Elizabeth Teegarden, Ph.D., then-Director of JHP, transferred Plaintiff to Ward 2. Plaintiff claims that Benedetti told her that "the Hospital needed someone like her to run Ward 2, who was capable of dealing with the administrative responsibilities that came with being the head of [ ] Mr. Hinckley's treatment team." *Id.* at 8. Plaintiff received "outstanding" performance assessments as the Clinical Adminis-

trator for Ward 2 for the 1994–95 and 1995–96 appraisal periods.

In 1994, Scott Lerner was hospitalized again, this time after making a threat against, among others, then-President Bill Clinton's daughter, Chelsea. The Secret Service again concluded that Scott posed no threat.

In June 1996, Hinckley's treatment team (which was headed by Plaintiff) "unanimously agreed that Mr. Hinckley should have a conditional release once a month to visit his family, and that he should have B–City privileges,[5] without pre-notification to the court." *Id.* at 10–11. As the treatment team leader, Plaintiff wrote a detailed report which was signed by the entire treatment team and presented to the Hospital Review Board in July 1996. The Hospital Review Board rejected the treatment team's recommendation.

In response to the Review Board's decision, Hinckley's counsel, Barry Levine, filed a motion in the United States District Court for the District of Columbia seeking the privileges that the treatment team had recommended. The district court scheduled a four-day evidentiary hearing for June 1997 to consider Hinckley's motion for conditional release. According to Plaintiff, Levine "made it clear . . . that, as the head of the treatment team that had recommended the privileges, he expected to subpoena her to testify, and would question her regarding her own professional opinion, as written in the treatment team's report." *Id.* at 12.

---

well as Presidential Press Secretary James Brady, Secret Service Agent Timothy McCarthy, and Metropolitan Police Officer Thomas Delahanty. *See Hinckley v. United States,* 163 F.3d 647, 648–49 (D.C.Cir.1999), *petition for reh'g en banc denied,* 174 F.3d 238 (D.C.Cir. 1999). In 1982, Hinckley was found not guilty by reason of insanity and committed to St. Elizabeths Hospital, where he has remained ever since. *See id.*

5. St. Elizabeths classifies its patients in four groups: A, B, C and D. Hinckley's treatment team recommended that Hinckley be classified as a "Class B" patient. A "B–City" privilege is one that is available to "Class B" patients, and includes the ability to take "excursions off Hospital grounds under Hospital supervision." *Hinckley,* 163 F.3d at 649.

Shortly thereafter, Plaintiff alleges that Assistant U.S. Attorneys Thomas Zeno and Robert Chapman contacted Benedetti to discuss Plaintiff's anticipated testimony at the Hinckley hearing. Plaintiff claims that Zeno and Chapman told Benedetti that they had learned that Scott Lerner made threats against the President in 1988, and that he was bi-polar and HIV-positive. Plaintiff also claims that they told Benedetti that if she testified in favor of the recommended privileges, they would "haul out" this information and use it to "damage" her credibility. *Id.* at 13. According to Plaintiff, Benedetti contacted Teegarden regarding this information. Plaintiff maintains that "Benedetti and Teegarden then decided to use the information they had obtained from the U.S. Attorneys in an effort to compel [her] to refuse to testify in the hearing, or, at least, to alter her testimony so that she conformed her testimony to the Hospital's position regarding Mr. Hinckley." *Id.*

It is undisputed that the Commission on Mental Health Services ("CMHS") was under court-ordered receivership when Plaintiff alleges Defendants commenced their threatening and harassing conduct. *See Dixon v. Barry,* 967 F.Supp. 535 (D.D.C. 1997).[6]

### 2. Disputed Facts

Despite Defendants' failure to identify their opposition to or agreement with any of the factual allegations stated below, it is clear to the Court, from the long history of this case, that the following facts are in dispute:

Plaintiff claims that, on November 13, 1996, Benedetti and Teegarden called her into Teegarden's office and "continuously reiterated that 'if' [she] testified, all of the information about her son would be 'hauled out,' and that her credibility and reputation would be severely and permanently damaged." Pl.'s Opp'n at 14. According to Plaintiff, Benedetti and Teegarden told her that "they would not support her if she testified in a manner contrary to the Hospital's position on Mr. Hinckley," *id.,* and that Hinckley's case was "very political," and she should "be careful" and "watch" how she testified. *Id.* Plaintiff alleges that she "refused to succumb to this pressure and notified her supervisors that she intended to testify truthfully if called." *Id.* at 2.

Plaintiff claims that Defendants immediately retaliated against her by downgrading her performance appraisal, transferring Hinckley out of her ward, and denying her sick leave.

On February 6, 1999, Scott, Plaintiff's son, died of AIDS.

In April 1999, Elsa Walsh, a reporter for *The New Yorker* magazine, published an article about Hinckley in which Plaintiff was quoted as "confirming, and describing Drs. Benedetti's and Teegarden's threats against her and her son, and their overall efforts to suppress her truthful testimony in the Hinckley case." *Id.* at 21. Plaintiff alleges that she did not disclose any confidential medical information about Hinckley, and in fact refused to answer Walsh's

---

**6.** *Dixon* was a class action brought by mentally ill District of Columbia residents who did not require institutionalization. On June 13, 1997, the *Dixon* court imposed a receivership over CMHS after twenty-two years of the District's failure "to provide its residents with an integrated community based mental health system." *Dixon,* 967 F.Supp. at 554. In ear-

ly April 2001, the receivership was transformed into a transitional receivership, which oversaw the transition from CMHS to the Department of Mental Health ("DMH"). In 2002, the transitional receivership was lifted and the District of Columbia regained full control of its mental health system.

questions about Hinckley's current condition.

Plaintiff claims that shortly after the article appeared, her superiors, including Defendants Patterson, Henneberry, and Ritzia A. George, Post–Trial Branch Chief, "initiated a stream of adverse employment actions against [her], as part of a deliberate effort to drive her from her position, and to punish her for revealing their illegal actions in attempting to suppress her testimony." *Id.* at 22.

Specifically, on May 5, 1999, less than one month after the publication of the article, Defendant Henneberry, for the first time in Plaintiff's career at St. Elizabeths, denied Plaintiff's request for advance sick leave when she experienced a relapse of MS symptoms.

On June 26, 1999, Dr. Lorrie Stone, acting under Defendant Patterson's direction, filed an ethics charge against Plaintiff claiming that she "had violated Mr. Hinckley's rights by disclosing confidential medical information about him to the press without his consent." *Id.* at 22. On September 3, 1999, the Ethics Subcommittee assigned to investigate the ethics charge "recommended that [Plaintiff] should receive no more than a letter of reprimand for 'an exercise of bad judgment,' because she had violated a Hospital policy that prohibited a Hospital employee from talking to the press without express Hospital authorization."[7] *Id.* at 25.

On October 28, 1999, the Medical Staff Executive Committee adopted the findings of its Subcommittee. On February 11, 2000, the Hospital's Governing Body rejected the Medical Staff's recommendation and appointed a second Ethics Subcommittee to investigate the same charges. When the chair of the second Ethics Subcommittee recused himself, a third Ethics Subcommittee was appointed. On October 24, 2000, the third Ethics Subcommittee affirmed the conclusion of the first Ethics Subcommittee. On March 22, 2001, the second Medical Staff Executive Committee affirmed the conclusion of the first Medical Staff Executive Committee, which was to recommend only a letter of reprimand for "an exercise of bad judgment." To date, the Department of Mental Health, which is the final decision-maker, has yet to issue a final decision on the ethics charge.

On July 8, 1999, Defendant George recommended that Plaintiff be discharged for "inexcusable neglect of duty" and "dishonesty" for her failure to accurately record two days of leave in January 1999, a time when Plaintiff was at the hospital with her son who was in a coma and dying of AIDS. On July 13, 1999, Plaintiff received a Recommendation for Disciplinary Action. On August 16, 1999, she received an "advance notice" of proposed removal, and on November 1, 1999, she received an amendment thereto. While a removal hearing before a disinterested designee was scheduled for December 15, 1999, it was subsequently cancelled by the disinterested designee on December 14, 1999. On January 20, 2000, a new disinterested designee was appointed. On February 4, 2000, Plaintiff objected to the appointment of the particular disinterested designee because his office had processed her removal papers. Defendants concede that, since February 4, 2000, "[n]o further action has been taken on the proposed removal." Defs.' Mot. at 11.

On July 12, 1999, Plaintiff was transferred from her position as Clinical Administrator in JHP to the Psychology Depart-

---

**7.** The Ethics Subcommittee also found that the Hospital policy was unconstitutionally over-broad. Pl.'s Opp'n at 25.

ment in JHP. Plaintiff alleges that the transfer moved her "from a position in which she had excelled [for] over thirteen years, to a position where she would be required to assume responsibilities and perform tasks she had not performed for close to twenty years." *Id.* at 35. Plaintiff contends that "Henneberry's object was to put [her] in a position where she would inevitably fail, and then use that failure as a justification to terminate her." *Id.*

Plaintiff alleges that in January 2000, "she suffered an attack of MS symptoms . . . from which she never recovered." *Id.* at 38. Plaintiff's doctor, Dr. Tornatore, stated that Plaintiff's MS "had undergone an 'acute and catastrophic worsening' inconsistent with the course of normal relapsing/remitting MS." *Id.* He concluded that "the dramatic change in [Plaintiff]'s MS could not be explained by the normal course of the disease and was caused directly by the stress and anxiety associated with her abusive working environment." *Id.* Plaintiff alleges that she has been unable to work because of the extreme aggravation of her MS since February 2000.

### B. Procedural History

On June 30, 2000, Plaintiff filed the instant action under 42 U.S.C. §§ 1983, 1985(2), 1985(3), and the District of Columbia Whistleblower Act, D.C.Code §§ 1–615.51, *et seq.*, alleging that Defendants violated and conspired to violate her Constitutional rights guaranteed by the First and Fifth Amendments of the United States Constitution. On July 14, 2000, Plaintiff filed an Amended Complaint; on November 1, 2000, she filed a Second Amended Complaint which included essentially the same allegations as the Original Complaint, but added Defendants John Does 1 through 10.

In Count I of her Second Amended Complaint, Plaintiff claims that the District and individual Defendants Patterson, Henneberry, and George conspired to violate her First Amendment rights, in violation of 42 U.S.C. § 1985(3).[8] In Count II, she alleges that the District and individual Defendants Patterson, Henneberry, and George have deprived her of her constitutional right to due process under 42 U.S.C. § 1983. In Count III, she asserts that all named Defendants conspired to obstruct justice, namely, to interfere with her potential testimony at Hinckley's hearing, in violation of 42 U.S.C. § 1985(2). In Count IV, she maintains that the District and individual Defendants Patterson, Henneberry, and George violated D.C.Code §§ 1–615.51, *et seq.*, known as the District of Columbia Whistleblower Act. In Count V, she contends that individual Defendants Patterson, Henneberry, and George deprived her of her constitutional right to free speech under 42 U.S.C. § 1983.

Plaintiff seeks, with respect to all named Defendants, jointly and severally, (1) "compensatory and consequential damages to redress injuries suffered as a result of her transfer and constructive termination from her position as Clinical Administrator/Psychologist, including back pay for lost wages and lost benefits, and front pay for denial of [her] expected future earnings, in an amount appropriate to the proof presented at trial, but in no event less than $2.0 million," *see* Am. Compl. ¶ 182; and (2) "compensatory and consequential damages for their conspiracy to violate [her] rights secured under the First and Fifth Amendments . . . through 42 U.S.C. §§ 1983, 1985, 1985(2), and the District of Columbia Whistleblower Act of 1998, in an

---

**8.** On August 15, 2001, the Court dismissed Plaintiff's 42 U.S.C. § 1985(3) claim. *See Ler-* *ner v. Dist. of Columbia,* 00cv1590 (GK), August 15, 2001 Mem. Op., at 26.

amount appropriate to the proof presented at trial, but in no event less than $2.0 million." *See id.* ¶ 183.

Plaintiff seeks, with respect to individual Defendants George, Patterson, Henneberry, Benedetti, and Teegarden (1) "compensatory and consequential damages for their violation of [her] rights secured under the First Amendment ... through 42 U.S.C. § 1983 in an amount appropriate to the proof presented at trial, but in no event less than $2.0 million," *see id.* ¶ 184; (2) "punitive damages ... for their reckless disregard of, and callous indifference to, [her] constitutionally protected rights in an amount appropriate to the proof presented at trial, but in no event less than $2.0 million." *See id.* ¶ 185.

Plaintiff also seeks attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. § 1988 and D.C.Code § 1–616.14(a) and a declaratory judgment declaring that Defendants violated her constitutional and statutory rights.

On August 15, 2001, the Court granted in part and denied in part Defendants' first motion to dismiss Plaintiff's Second Amended Complaint. *See Lerner v. Dist. of Columbia,* 00cv1590 (GK), August 15, 2001 Mem. Op.. Specifically, the Court dismissed Count I of the Second Amended Complaint (Plaintiff's 42.U.S.C. § 1985(3) claim) and denied Defendants' motion as to Counts II, III, IV, and V. On May 27, 2003, the Court denied Defendants' second motion to dismiss Plaintiff's Second Amended Complaint. *See Lerner v. Dist. of Columbia,* 00cv1590 (GK), May 27, 2003 Mem. Op..

On November 10, 2003, Defendants filed the instant Motion for Summary Judgment.

On January 20, 2004, the Court denied Defendants' motion for leave to file an amended answer and raise the affirmative defenses of statute of limitations, qualified immunity, and failure to comply with D.C.Code § 12–309. *See* Docket No. 143.

## II. STANDARD OF REVIEW

Summary judgment should be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether the moving party has met this burden, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See Washington Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). Once the moving party makes its initial showing, however, the nonmoving party's opposition must consist of more than mere unsupported allegations or denials and must demonstrate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. *See McKinney v. Dole,* 765 F.2d 1129, 1135 (D.C.Cir.1985). Accordingly, at that point, the non-moving party is "required to provide evidence that would permit a reasonable [fact-finder] to find" in its favor. *Laningham v. United*

*States Navy,* 813 F.2d 1236, 1242 (D.C.Cir. 1987).

## III. ANALYSIS

### A. Defendants Are Not Entitled to Summary Judgment on Plaintiff's § 1983 Due Process Claim (Count II)

In Count II of her Second Amended Complaint, Plaintiff alleges that the District and individual Defendants Patterson, Henneberry, and George have deprived her of her constitutional right to due process under 42 U.S.C. § 1983. While Defendants concede that Plaintiff has a property right in her continued employment with the District, *see* Defs.' Mot. at 10, they argue that they are entitled to summary judgment on Plaintiff's § 1983 due process claim for three reasons. First, they claim that, as to the District, "Plaintiff [cannot] establish that the District's customs, practices, and policies are directly responsible for her alleged injuries." *Id.* (citing *Monell v. Dep't of Soc. Serv. of the City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Second, they contend that Plaintiff "has not been deprived of her employment and [has] received all the process she was due." *Id.* Third, they maintain that individual Defendants Patterson, Henneberry, and George are entitled to qualified immunity.

### 1. The District is not entitled to summary judgment on Plaintiff's § 1983 due process claim because the jury must determine whether the District's customs, practices, or policies are responsible for Plaintiff's alleged injuries

■ Defendants claim that the District is entitled to summary judgment on Count II under *Monell* because "Plaintiff [cannot] establish that the District's customs, practices, and policies are directly respon-

sible for her alleged injuries." Defs.' Mot. at 10.

■ Under *Monell,* a municipality such as the District may be held liable under § 1983 "only when the execution of its official policy or custom is responsible for the deprivation of constitutional rights." *Morgan v. Dist. of Columbia,* 824 F.2d 1049, 1058 (D.C.Cir.1987). To succeed on a § 1983 claim against the District, Plaintiff must show (1) "a course deliberately pursued by the city, 'as opposed to an action taken unilaterally by a nonpolicymaking municipal employee,'" and (2) "'an affirmative link between the [city's] policy and the particular constitutional violation alleged.'" *Carter v. Dist. of Columbia,* 795 F.2d 116, 122 (D.C.Cir. 1986) (internal citation omitted).

■ As the Supreme Court explained in *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), "the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." "The issue of final policymaking authority is one of state law." *Triplett v. Dist. of Columbia,* 108 F.3d 1450, 1453 (D.C.Cir.1997). Once the trial judge has identified those officials with the power to make official policy on a particular issue, "it is for the jury to determine whether *their* decisions have caused the deprivations of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Dallas Indep. Sch. Dist.,* 491 U.S. at 737 (emphasis in original) (internal citation omitted).

Plaintiff claims that individual Defendants Patterson, Henneberry, and George were "the final policymaking authorities responsible under state law for making personnel policy at St. Elizabeths Hospital, including policy about the Hospital's response to mental health providers, like [Plaintiff], who fail to tailor their professional opinions to meet the desired political goals of the government." Pl.'s Opp'n at 44. Defendants, relying on *Triplett,* claim that only the Director of an agency, the Mayor, or the City Council can have final policymaking authority. Defendants' reliance on *Triplett* is, however, misplaced.

In *Triplett,* a prisoner sued the District of Columbia for injuries inflicted by two correctional officers. There was testimony that "supervisors," an unnamed sergeant and a Lieutenant King, knew of the alleged practice of using excessive force. The Court of Appeals reversed a finding of liability, stating that "[t]here is no one in this case's cast of characters who could possibly be said to hold 'final policymaking authority' regarding the use of force in restraining prisoners." *Id.* at 1453. It was in this context only that the Court of Appeals noted that there was no proof that "the Director, the Mayor or the City Council knew of or disregarded a practice of excessive force. . . ." *Id. See Caldwell v. Hammonds,* 53 F.Supp.2d 1, 8 (D.D.C. 1999) ("No case from our Court of Appeals holds, as a matter of law, that only the Mayor, the City Council, and the Director of the Department of Corrections can be final policymakers."). Since Defendants have offered no other authority to counter Plaintiff's claim that individual Defendants Patterson, Henneberry, and George—all of whom were high-level administrators at St. Elizabeths—were the final policymaking authorities, they have failed to carry their burden of showing that they are entitled to summary judgment.

Whether the District's customs, practices, or policies are responsible for Plaintiff's alleged injuries is a question for the jury. *See Dallas Indep. Sch. Dist.,* 491 U.S. at 737, 109 S.Ct. 2702. As such, the District is not entitled to summary judgment on Plaintiff's § 1983 due process claim.

**2. Defendants are not entitled to summary judgment on Plaintiff's § 1983 due process claim because there are material facts in dispute regarding whether Plaintiff was constructively discharged**

Defendants contend that Plaintiff "has not been deprived of her employment and [has] received all the process she was due." Defs.' Mot. at 10.

■ In order to establish a deprivation of property without due process, Plaintiff must demonstrate (1) that she was deprived of a protected property interest; and (2) that Defendants deprived her of that interest without providing the process that was due. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). While Defendants concede that Plaintiff has a property right in her continued employment with the District of Columbia, they claim that she has not suffered a deprivation of a significant property interest because her termination proceeding is still pending. Plaintiff maintains that "[D]efendants' deliberate and unrelenting campaign of harassment and retaliation" constituted constructive discharge. Pl.'s Opp'n at 49.

"A 'finding of constructive discharge depends on (whether the employer) deliberately made . . . working conditions intolerable and drove (the employee) into an involuntary quit.' " *Clark v. Marsh,* 665 F.2d 1168, 1173 (D.C.Cir.1981) (quoting *Retail Store Employees Union Local*

*880 v. NLRB,* 419 F.2d 329, 332 (D.C.Cir. 1968) (internal citation omitted)).

Plaintiff alleges that her superiors transferred her, downgraded her performance appraisal, denied her sick leave when she experienced a relapse of MS symptoms, attempted to blackmail her and prevent her from testifying in court, initiated multiple baseless ethics investigations of her activities, and attempted to terminate her employment—all in retaliation for her recommending the twelve-hour-per-month conditional release of Hinckley, agreeing to testify at Hinckley's release hearing, and agreeing to be interviewed for a *New Yorker* article on Hinckley and the threats made against her by her superiors. Based on the evidence which Plaintiff has presented, a reasonable juror could conclude that Defendants deliberately made Plaintiff's working conditions "intolerable" and drove her to resign.

Since a reasonable juror could conclude that Plaintiff was deprived of a protected property interest, the question remains whether Defendants deprived her of that interest without providing the process that was due. Plaintiff claims that Defendants failed to provide her "due process" because they failed to follow their own procedures as established in the District of Columbia Municipal Regulations, *see* D.C. Mun. Regs., tit. 6, § 1600, *et seq.,* and the collective bargaining agreement between the Psychologists Union of the District of Columbia Commission on Mental Health Services and the District of Columbia Department of Human Services, *see* Pl.'s Opp'n, Ex. 28.[9] Specifically, Plaintiff points to § 1614.2 of the District of Columbia Municipal Regulations which provides that

"[t]he final decision shall be rendered at the earliest practicable date." D.C. Mun. Regs., tit. 6, § 1614.2. She also points to Article 16, Section 10 of the collective bargaining agreement which provides that a written decision on a disciplinary matter shall be issued "within forty-five (45) days from the date of receipt of the notice of proposed action." Pl.'s Opp'n, Ex. 28, at 41. Defendants claim only that Plaintiff's employment "is governed by the Comprehensive Merit Personnel Act ... and a collective bargaining agreement." Def.'s Mot. at 11.

In the employment context, "agencies cannot 'relax or modify' regulations that provide the only safeguard individuals have against unlimited agency discretion in hiring and termination." *Lopez v. FAA,* 318 F.3d 242, 247 (D.C.Cir.2003). Thus, "where 'a government employee has no procedural due process rights apart from those which the agency has chosen to create by its own regulations, scrupulous compliance with those regulations is required to avoid any injuries.'" *Id.* at 247 (quoting *Mazaleski v. Treusdell,* 562 F.2d 701, 719 (D.C.Cir.1977)). Accordingly, "[w]hen agencies establish 'special' 'pretermination procedures,' they are bound to follow them." *Lopez,* 318 F.3d at 247 (quoting *Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1098 (D.C.Cir. 1985)).

Against this backdrop, it is clear that "scrupulous compliance" with the collective bargaining agreement, which entitles Plaintiff to a hearing and final decision within 45 days from the date of receipt of

---

9. Pursuant to § 1601.2 of the District of Columbia Municipal Regulations, the collective bargaining agreement is controlling. *See* D.C. Mun. Regs., tit. 6, § 1601.2 ("Any procedural system for the review of adverse actions negotiated between the District of Columbia and a labor organization shall take precedence over the provisions of this chapter for employees in a bargaining unit represented by a labor organization, to the extent that there is a difference.").

the notice of proposed action, is required. Moreover, Defendants have offered no argument or authority contradicting Plaintiff's claim that she is entitled to such a hearing and a final decision. Thus, they have failed to carry their burden of showing that they are entitled to summary judgment.[10]

On July 13, 1999, Plaintiff received a Recommendation for Disciplinary Action. On August 16, 1999, she received an "advance notice" of proposed removal, and on November 1, 1999, she received an amendment thereto. While a removal hearing before a disinterested designee was scheduled for December 15, 1999, it was cancelled by the disinterested designee on December 14, 1999. On January 20, 2000, a new disinterested designee was appointed. On February 4, 2000, Plaintiff objected to the appointment of the particular disinterested designee because his office had processed her removal. Defendants concede that, since February 4, 2000, "[n]o further action has been taken on the proposed removal." Defs.' Mot. at 11. "It has now been over four years since [Plaintiff] received notice of her proposed removal and she has not received a written decision, in clear contravention of the applicable process." Pl.'s Opp'n at 52. Accordingly, the Court finds that, if the jury concludes that Plaintiff was constructively discharged, Defendants have failed to provide Plaintiff the process she was due.

### 3. Individual Defendants Patterson, Henneberry, and George are not entitled to qualified immunity

Defendants maintain that individual Defendants Patterson, Henneberry, and George are entitled to qualified immunity. Plaintiff claims that Defendants have waived this defense because they failed to plead it in either of their two previous motions to dismiss or in their Answer to the Second Amended Complaint.

The defense of qualified immunity is an affirmative defense. *See Pate v. United States*, 277 F.Supp.2d 1, 7 (D.D.C. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "[A]ffirmative defenses must be raised in a responsive pleading, not a dispositive motion." *Harris v. United States Dep't of Veterans Affairs*, 126 F.3d 339, 341 (D.C.Cir.1997). " 'A party's failure to plead an affirmative defense ... generally results in the waiver of that defense and its *exclusion from the case.*' " *Id.* at 343 (quoting *Dole v. Williams Enterprises, Inc.*, 876 F.2d 186, 189 (D.C.Cir. 1989) (emphasis in original) (internal citation omitted)).

In the instant case, Defendants failed to plead the affirmative defense of qualified immunity in either of their two previous motions to dismiss or in their Answer to the Second Amended Complaint.[11] Accordingly, Defendants have waived this de-

---

**10.** Defendants do allege that, as of February 2000, any action for removal was moot because Plaintiff's treating physician indicated that she could no longer work. Plaintiff maintains that the removal hearing is not "moot" because "whether and how [she] is removed from her position has significant implications for salary, retirement and disability payments." Pl.'s Opp'n at 57. Since Defendants cite to no argument or authority contradicting this claim, they have failed to carry their burden of showing they are entitled to

summary judgment as a matter of law because of mootness.

**11.** On January 20, 2004, three and one-half years after the filing of the Original Complaint, Defendants sought leave to raise this defense in an Amended Answer. The Court denied the motion because of its extreme untimeliness. *See generally* January 20, 2004 Order, Docket No. 143.

fense and it must be excluded from the case.[12]

## B. Defendants Are Not Entitled to Judgment as a Matter of Law on Plaintiff's Conspiracy to Obstruct Justice Claim (Count III)

In Count III of her Second Amended Complaint, Plaintiff alleges that all named Defendants conspired to obstruct justice, namely, to interfere with her potential testimony at Hinckley's hearing, in violation of 42 U.S.C. § 1985(2).[13] Defendants argue that they are entitled to summary judgment on Plaintiff's conspiracy to obstruct justice claim for four reasons. First, they assert that, as to individual Defendants Patterson and Henneberry, "[a]t the time of the Hinckley hearing, [they] were not District of Columbia employees [, and thus] they could not have been involved in any conspiracy to prevent [P]laintiff from testifying." Defs.' Mot. at 15. Second, they allege that Plaintiff cannot establish a *prima facie* case of conspiracy. Specifically, they maintain that "there is no evidence show [sic] any agreement or an overt act." *Id.* at 16. Third, they maintain that "Plaintiff's averments that the District and its employees conspired with one another to prevent [Plaintiff] from testifying[ ] defeat[ ] her claim since the District and its employees and agents are a single entity that cannot conspire with itself." *Id.* at 19. Fourth, they allege that Plaintiff's claim is barred by the applicable statute of limitations.

 The first clause of § 1985(2) prohibits conspiracies to interfere with judicial proceedings in federal court. *See* 42 U.S.C. § 1985(2). Thus, to state a claim under this section, Plaintiff must allege "(1) a conspiracy between two or more persons, (2) to deter a party, witness or juror from attending or testifying in any

12. The Sixth Circuit, faced with the issue of waiver of the qualified immunity defense at the pleadings stage in *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir.1994), concluded that "the trial court has discretion to find a waiver if a defendant fails to assert the defense within the time limits set by the court or if the court otherwise finds that a defendant has failed to exercise due diligence or has asserted the defense for dilatory purposes." Both the First and Third Circuits have adopted this position. *See Guzman–Rivera v. Rivera–Cruz*, 98 F.3d 664, 668 (1st Cir.1996) ("defense of qualified immunity may be deemed to have been waived if it is not raised in a diligent manner during the post-discovery, pre-trial phase"); *Eddy v. Virgin Islands Water and Power Authority*, 256 F.3d 204, 210 (3rd Cir.2001) ("[T]he District Court must exercise its discretion and determine whether there was a reasonable modicum of diligence in raising the defense [of qualified immunity]. The District Court must also consider whether the plaintiff has been prejudiced by the delay.").

This issue has not been directly addressed by our Circuit. These cases, however, present a well-reasoned analysis. Applying that analysis to the instant case, it is clear that Defendants have waived the qualified immunity defense and it must be excluded from the case. First, there was no "reasonable modicum of diligence in raising the defense." *Eddy*, 256 F.3d at 210. Indeed, Defendants waited more than three and one-half years before seeking leave to raise this defense in an Amended Answer. Second, there is no question that Plaintiff would be significantly prejudiced by the delay generated by claims of qualified immunity. This case has already dragged on for close to five years, and a trial date is still almost nine months away.

13. Section 1985(2), titled "Obstructing justice, intimidating party, witness, or juror," states, in relevant part:

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his [sic] having so attended or testified ....
42 U.S.C. § 1985(2).

matter pending in any court of the United States, which (3) results in injury to the plaintiff." *Graves v. United States,* 961 F.Supp. 314, 319 (D.D.C.1997). The Supreme Court explained that:

[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of the other.

*Salinas v. United States,* 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). *See United States v. Bridgeman,* 523 F.2d 1099, 1108 (D.C.Cir.1975) ("where the evidence shows that a defendant knew of the conspiracy, associated himself with it, and knowingly contributed his efforts during its life to further its design, he may be convicted of the conspiracy"). Therefore, liability exists even where a defendant joins the conspiracy after it began, does not participate in all acts of the conspiracy, and where acts in furtherance of the conspiracy take place prior to and after the defendant joins the conspiracy. *See Bridgeman,* 523 F.2d at 1108; *Salinas,* 522 U.S. at 65, 118 S.Ct. 469 ("One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.").

■ First, Defendants contend that they are entitled to summary judgment on Plaintiff's conspiracy claim as to individual Defendants Patterson and Henneberry because "[a]t the time of the Hinckley hearing, [they] were not District of Columbia employees[, and thus] they could not have been involved in any conspiracy to prevent

[P]laintiff from testifying." Defs.' Mot. at 15. This argument fails because Plaintiff does not need to show that individual Defendants Patterson and Henneberry participated in all acts of the conspiracy. *See Bridgeman,* 523 F.2d at 1108. Instead, she must show only "that actions taken by [D]efendants Patterson and Henneberry after they joined the conspiracy were taken in furtherance of the [D]efendants' overarching conspiracy to obstruct justice." Pl.'s Opp'n at 70.

■ Second, Defendants allege that Plaintiff cannot establish a *prima facie* case of conspiracy. Specifically, they maintain that "there is no evidence show [sic] any agreement or an overt act." Defs.' Mot. at 16. Plaintiff alleges that Defendants Teegarden and Benedetti, in collusion with other St. Elizabeths and government officials, attempted to "blackmail" her by threatening to use sensitive and embarrassing information about her son to suppress and/or modify her subpoenaed testimony at Hinckley's court hearing. She also alleges that, while she was still under subpoena, she was retaliatorily transferred out of Hinckley's ward, denied leave, wrongly accused of arriving late to work, and had her performance rating lowered. If this evidence, which is very much in dispute, were believed, a reasonable juror could easily conclude that all named Defendants were involved in a conspiracy.

■ Third, Defendants maintain that "Plaintiff's averments that the District and its employees conspired with one another to prevent her from testifying[ ] defeat[ ] her claim since the District and its employees and agents are a single entity that cannot conspire with itself."[14] Defs.'

14. Defendants cite *Michelin v. Jenkins,* 704 F.Supp. 1, 4 (D.D.C.1989), *Hilliard v. Ferguson,* 30 F.3d 649, 653 (5th Cir.1994) and *Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Educ.,* 926 F.2d 505, 510 (6th Cir.1991) in support of the "general rule that a municipality cannot conspire with itself." Def.'s Mot. at 19. Those cases are, however, inapplicable to the instant case. In each of those cases, the court held that a school board

Mot. at 19. Although it is far from clear from the papers, Defendants may be attempting to assert the "intracorporate conspiracy doctrine" as a bar to Plaintiff's conspiracy claim. Under that doctrine, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1035–36 (11th Cir.2000) (finding that conspiracies under § 1985(2) are criminal in nature and thus the intracorporate conspiracy doctrine does not apply). The intracorporate conspiracy doctrine does not bar Plaintiff's claim because there are alleged participants in the conspiracy who are not employees of the District, namely John Does One through Ten, who are Assistant United States Attorneys and Secret Service Agents employed by the federal government. *See Tripp v. Executive Office of the President*, 200 F.R.D. 140, 150–51 (D.D.C.2001) (under the intracorporate conspiracy doctrine, "two or more individuals within the same legal entity cannot form a legal conspiracy").

 Fourth, Defendants allege that Plaintiff's claim is barred by the applicable statute of limitations. Plaintiff claims that Defendants have waived this defense because they failed to plead it in either of their two previous motions to dismiss or in their Answer to the Second Amended Complaint.

The defense of statute of limitations is an affirmative defense. *See Harris*, 126 F.3d at 343. Defendants failed to plead it in either of their two previous motions to dismiss or in their Answer to the Second Amended Complaint. As discussed *supra*, Defendants have thus waived this defense and it must be excluded from the case.

and its employees constitute a single legal entity which is incapable of conspiring with

For the foregoing reasons, Defendant is not entitled to summary judgment on Plaintiff's conspiracy to obstruct justice claim.

## C. Defendants Are Not Entitled to Summary Judgment on Plaintiff's Whistleblower Act Claim (Count IV)

In Count IV of her Second Amended Complaint, Plaintiff alleges that the District and individual Defendants Patterson, Henneberry, and George violated D.C.Code § 1–615.51, *et seq.*, known as the District of Columbia Whistleblower Act ("Whistleblower Act" or "Act"). The purpose of that Act is to protect employees of the District when they disclose "waste, fraud, abuse of authority, violations of the law, or threats to the public health or safety." D.C.Code § 1–615.51. The Act provides that "[a] supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order." *Id.*, § 1–615.53.

A "prohibited personnel action" includes, *inter alia*, "recommended, threatened, or actual termination, demotion, suspension, or reprimand, involuntary transfer, reassignment, or detail, ... or retaliating in any other manner against an employee because that employee makes a protected disclosure or refuses to comply with an illegal order...." *Id.*, § 1–615.52(5). A "protected disclosure" includes "any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences ... [a] viola-

itself.

tion of a federal, state, or local law, rule, or regulation." *Id.,* § 1–615.52(a)(6). The term "supervisor" is defined as any employee who has the "authority to effectively recommend or take remedial or corrective action for the violation of a law, rule, regulation ..., including without limitation an agency head, department director, or manager." *Id.,* § 1–615.52(a)(8). An "illegal order" is defined as "a directive to violate or to assist in violating a federal, state or local law, rule or regulation." *Id.,* § 1–615.52(a)(4).

Defendants argue that they are entitled to summary judgment on Plaintiff's Whistleblower Act claim for four reasons. First, they claim that it is barred by the applicable statute of limitations. Second, they allege that it is barred by Plaintiff's failure to comply with D.C.Code § 12–309. Third, they maintain that the Act is inapplicable to this case because Plaintiff made no "protected disclosure." Fourth, they assert that Plaintiff cannot show that their alleged misconduct proximately caused her injuries because the court-ordered receivership stripped them of any authority to act, and thus, of any liability for their actions.

First, Defendants claim that Plaintiff's Whistleblower Act claim is barred by the applicable statute of limitations. This claim is without merit because, as discussed *supra,* Defendants have waived this defense and it must be excluded from the case.

Second, they allege that it is barred by Plaintiff's failure to comply with D.C.Code § 12–309. Plaintiff claims that Defendants have waived this defense because they failed to plead it in either of their two previous motions to dismiss or in their Answer to the Second Amended Complaint.

█ The defense of failure to comply with D.C.Code § 12–309 is, like qualified immunity and the statute of limitations, an affirmative defense. *See Sanders v. Dist. of Columbia,* 2002 WL 648965 *3 (D.D.C.) (finding that the District waived its right to timely notice under D.C.Code § 12–309 "by permitting itself to be sued for over four years without raising the failure to provide notice"). Defendants failed to plead this affirmative defense in either of their two previous motions to dismiss or in their Answer to the Second Amended Complaint. As discussed *supra,* Defendants have thus waived this defense and it must be excluded from the case.

Third, Defendants maintain that the Act is inapplicable to this case because Plaintiff made no "protected disclosure." This argument fails because Plaintiff does not rely on the "protected disclosure" clause of the Act; instead, she relies on the "illegal order" clause, which independently gives rise to a Whistleblower Act claim. *See* D.C.Code, § 1–615.53.

Fourth, Defendants claim that Plaintiff cannot show that their alleged misconduct proximately caused her injuries because the court-ordered receivership stripped them of any authority to act, and thus, of any liability for their actions. This Court has, however, already found the District and individual Defendants jointly and severally liable as joint tortfeasors for all of Plaintiff's alleged injuries. *See Lerner v. Dist. of Columbia,* No. 00cv1590 (GK), May 27, 2003, Mem. Op., at 10.

For the foregoing reasons, Defendants are not entitled to summary judgment on Plaintiff's Whistleblower Act claim.

**D. Defendants Are Not Entitled to Summary Judgment on Plaintiff's First Amendment Claim (Count V)**

█ In Count V of her Second Amended Complaint, Plaintiff alleges that individ-

ual Defendants Patterson, Henneberry, and George, deprived her of her constitutional right to free speech under 42 U.S.C. § 1983. During the relevant time period in this case, Plaintiff was employed by St. Elizabeths Hospital, which was under court-ordered receivership; accordingly, she must be considered a "public" employee for purposes of her First Amendment retaliation claim. "The speech of public employees ... enjoys considerable First Amendment protection; the Supreme Court has 'unequivocally rejected' the proposition that public employees 'may be constitutionally compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest.'" *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C.Cir.1998) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

To state a claim that Defendants retaliated against her, in violation of her First Amendment rights, Plaintiff must satisfy a four-factor test (sometimes known as the *Pickering* test). *See O'Donnell*, 148 F.3d at 1133 (citing *Hall v. Ford*, 856 F.2d 255, 258 (D.C.Cir.1988)). First, Plaintiff must show that she was engaged in protected speech, i.e., that she was speaking on a matter of "public concern." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). Second, the Court must consider whether "the governmental interest in promoting the efficiency of the public services it performs through its employees without disruption outweighs [her] interest, as a citizen, in commenting upon matters of public concern, and the interest of potential audiences in hearing what [she] has to say." *O'Donnell*, 148 F.3d at 1133 (internal citation omitted). Third, Plaintiff must show that her speech was a "substantial or motivating factor in prompting the retaliatory or punitive act of which she complains." *Id.* (citing *Mt. Healthy City Sch. Bd. of*

*Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Fourth, Plaintiff's employer "should have an opportunity to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." *O'Donnell*, 148 F.3d at 1133.

 The first two factors are "'questions of law for the court to resolve;'" the second two are "'questions of fact ordinarily for the jury.'" *Id.* (citing *Tao*, 27 F.3d at 639).

Defendants argue that they are entitled to summary judgment on Plaintiff's First Amendment retaliation claim for four reasons. First, they claim that they are entitled to summary judgment on Plaintiff's First Amendment retaliation claim because they "lacked the authority to take the alleged personnel actions complained about by Plaintiff because CMHS was under receivership." Defs.' Mot. at 25. This argument is without merit. As already noted, the Court has found the District and individual Defendants jointly and severally liable as joint tortfeasors for all of Plaintiff's alleged injuries. *See Lerner v. Dist. of Columbia*, No. 00cv1590 (GK), May 27, 2003 Mem. Op., at 10.

 Second, Defendants maintain that Plaintiff "has failed to establish [their] alleged wrongful conduct." *Id.* at 26. Specifically, they allege that their refusal to allow Plaintiff to correct her attendance records relating to her leave at the time of her son's death does not violate Plaintiff's First Amendment rights. Based on all the evidence Plaintiff has presented, a reasonable juror could find that Defendants' refusal was retaliatory. Moreover, Plaintiff's First Amendment claim does not turn solely on Defendants' allegedly retaliatory refusal. Rather, it encompasses not only the transfer, demotion, and removal actions, but also the multiple ethics investi-

gations, the alleged attempts to coerce or suppress her testimony, the allegedly retaliatory downgrading of her performance evaluation, and the retaliatory hostile work environment to which she claims she was subjected.

Third, Defendants contend that Plaintiff "has not shown that her injuries stemmed from a District policy, custom, or practice, which is necessary to find the District liable under *Monell.*" Defs.' Mot. at 25. This argument is unpersuasive because whether the District's customs, practices, or policies are responsible for Plaintiff's alleged injuries is a question for the jury. *See Dallas Indep. Sch. Dist.*, 491 U.S. at 737, 109 S.Ct. 2702.

Fourth, Defendants claim that they are entitled to qualified immunity. This claim is without merit because, as discussed *supra*, Defendants have waived this defense and it must be excluded from the case.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment is **denied**.

An Order will issue with this opinion.